## STACY *v.* STACY.

### Opinion delivered December 12, 1927.

1. WITNESSES—COMPETENCY OF WIFE AS WITNESS.—In an action by a husband to quiet title, where the pleadings, depositions and decree show that his wife was treated as a party plaintiff, she was competent as a witness, though there was no formal order entered of record making her a party.

2. QUIETING TITLE—NECESSARY PARTIES.—Where the deposition of a plaintiff in an action to quiet title showed that his wife owned a half interest in the purchase money of the land in controversy, she was a necessary party, and making her a party plaintiff did not substantially change the cause of action.

3. TRUSTS—EVIDENCE.—An allegation that plaintiff's son purchased the land in controversy in his own name, and that plaintiff furnished the cash payment and became liable for deferred payments with the understanding that the son should hold the legal title for plaintiff's use and benefit, *held* to justify the introduction of testimony to prove either an express or an implied trust.

4. TRUSTS—ESTABLISHMENT OF EXPRESS TRUST.—To establish an express trust, it is necessary to show that, before or at the time land was purchased, the one holding title executed and delivered some writing declaring that he held it in trust.

5. TRUSTS—PROOF OF IMPLIED TRUST.—The term "implied trust" includes resulting trusts and trusts *ex maleficio* or constructive trusts, and arises or results by implication of law, and may be proved by oral testimony, under Crawford & Moses' Dig., § 4868.

6. TRUSTS—RESULTING TRUSTS DEFINED.—Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently or in violation of any fiduciary duty, but where the intent appears or is

inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title.

7. TRUSTS—WHEN CONSTRUCTIVE TRUST NOT ESTABLISHED.—Where a son acquired property in his own name, using his father's money, but expressly recognized that his father was entitled to a quitclaim deed, no constructive trust arises.

8. TRUSTS—PROOF OF RESULTING TRUST.—While it is necessary that proof to establish a resulting trust should be clear, satisfactory and convincing, it is not essential that it be undisputed.

9. TRUSTS—WHEN RESULTING TRUST ESTABLISHED.—In order to constitute a resulting trust, the purchase money or a specified part of it must be paid by another or secured by another at the time or previous to the purchase, and must be a part of that transaction.

10. TRUSTS—SUFFICIENCY OF EVIDENCE.—Evidence *held* sufficient to support a finding that parents, by advancing the purchase price of land and allowing the son to take title, did not intend the gift by way of advancement, but that a resulting trust in their favor should be created.

11. DESCENT AND DISTRIBUTION—EFFECT OF ADVANCEMENT.—Advancement, which is a gift by the parent to a child in anticipation of what the child will be entitled to on parent's death, is an irrevocable gift.

12. DESCENT AND DISTRIBUTION—PRESUMPTION OF ADVANCEMENT.—Purchase of land by father and mother and direction by them that deed should be made in the name of the son, *held* to raise a presumption of advancement.

13. ESTOPPEL—EVIDENCE.—In a suit to quiet title to land, evidence *held* not to establish that parents were estopped from showing that their son held land for them as a resulting trust.

Appeal from Crittenden Chancery Court; *J. M. Futrell,* Chancellor; affirmed.

*L. Neill Reed,* for appellant.

*Davis, Costen & Wallace,* for appellee.

WOOD, J.  This is an action by E. A. Stacy and his wife, Lizzie Harvey Stacy, against Zoe D. Stacy, widow of John Latham Stacy, John Latham Stacy, Jr., Rose Elizabeth Stacy, Jean Stacy and Allen Dodson Stacy, minor children of John Latham and Zoe D. Stacy.  John Latham Stacy hereafter, for convenience, will be referred to as J. L. Stacy.  It is alleged, in substance, in the complaint that E. A. Stacy and wife are parents

of J. L. Stacy, deceased; that J. L. Stacy purchased in his own name a certain tract of land in Crittenden County, described in the complaint, consisting of about one hundred acres; that the purchase money to make the cash payments was furnished by the plaintiffs, and they became liable also for the deferred payments; that it was the understanding between them and J. L. Stacy, their son, that he should hold the legal title to the property for the use and benefit of the plaintiffs; that neither the purchase money nor the land was intended as a gift or advancement to their son, J. L. Stacy. The prayer of the complaint was that the defendants be declared to hold the legal title in trust for the plaintiffs and that plaintiffs' title be quieted as against the defendants.

All of the material allegations of the complaint which the defendants desired to controvert were denied, and properly put in issue by answers filed for the defendants. Mrs. Zoe D. Stacy, the widow, admitted the purchase by her husband of the lands in controversy, but denied that the plaintiffs furnished the cash payments and that they became liable for the further payments on the land. She denied that any money furnished by the plaintiffs to her husband, J. L. Stacy, was not intended as a gift or advancement. She alleged that, by the death of her husband, she was entitled to dower and homestead in the lands in controversy, and that their minor children were seized in fee of the lands in controversy, subject to her dower and homestead rights. By way of cross-complaint the defendants alleged that plaintiffs had converted the rents and profits of the lands for the years 1924 and 1925, and they prayed for all proper relief.

E. A. Stacy testified, in substance, that he lived at Piedmont, California, and also at Dell, Arkansas. His occupation had been that of a planter. He was the father of John Stacy, deceased, who died in March, 1924, leaving surviving him his widow and the minor children named, his only heirs at law, the defendants herein. The oldest of the children was born in 1916 or 1917 and the others about one year apart thereafter. On February

6, 1922, J. L. Stacy entered into a contract with Mrs. Shell Gleason for the purchase of her homestead and dower interest in the lands in controversy, by the terms of which Stacy was to pay Mrs. Gleason $300 cash as earnest money and the further sum of $1,000 in the event that he succeeded in purchasing at a probate sale the interest of the two minor heirs of Shell Gleason, for which he was to pay a sum not in excess of $5,000. If he succeeded in making the purchase at the probate sale he was to execute his note in the sum of $700, balance of the purchase money, to Mrs. Shell Gleason, payable December 1, 1922, at six per cent. per annum from date. In the event Stacy failed to make the purchase at the probate sale, he was to have the rental of the property for the year 1922 in consideration of the earnest money already paid. That contract was the beginning of the negotiations which afterwards resulted in the consummation of the purchase of the lands in controversy by J. L. Stacy. Witness had sold the Green River place belonging to his wife, consisting of about 900 acres, to one Jennings, and was living in Piedmont, California. His son, Latham, continued to superintend the River place for Jennings. As soon as his son informed witness that Gleason had died and the Gleason place would have to be sold, witness suggested to his son that this was the place witness wanted, because it would be a good harbor for them from the River place in case of overflow, as this Gleason land, consisting of about 100 acres, was behind the levee. Witness instructed his son to begin negotiations for the purchase of it at once, and the above contract with Mrs. Gleason was the line adopted by his son for the purchase. Witness' suggestion to purchase the place came from witness, as witness was to supply the money. His son did not have any money. Witness furnished the money to pay Mrs. Gleason. The sale was afterwards made to J. L. Stacy, witness paying the necessary money. Witness paid both the money that went to Mrs. Gleason and also the other part of the purchase money. His son, J. L. Stacy, would advise witness of the

amounts owing, and witness would pay the same through his son. Witness sent checks, and they came back canceled. When witness bought the land through his son, the deed was taken in J. L. Stacy's name because it was the purpose of witness and his wife to give their son, J. L. Stacy, when witness died, that part of the estate known as the Green River place. They wanted to give J. L. Stacy that place because it would afford him a substantial income for the support of his large and growing family. Witness did not know how long his son would work for Jennings, and it was time for him to be embarking in some enterprise of his own and getting a start in life. That is the reason why witness had spent $7,000 through his son, J. L. Stacy, in an effort to clear up the River place. When Gleason died, witness saw the opportunity of acquiring the land in controversy, and he took up the purchase thereof through his son and "put the thing in his name that he might have the chance of setting out in life," with that place in view. However, nothing at all was ever said about giving him that place before witness and his wife died. They had no idea of dividing their estate before death. They wanted him to have that place as a part of their inheritance at their death. They expected to leave him that in their wills, and wanted to make it as productive as possible when they left it. The place was bought for the estate of witness and wife. Witness and his wife each owned one-half of the purchase money that was furnished to purchase the place. Witness acted as his wife's agent in making the purchase. J. L. Stacy held the particular tract of land in controversy in trust for the use and benefit of witness and wife. J. L. Stacy offered by letter to convey the land. Witness received a letter from his son, J. L. Stacy, to the effect that he would make witness a deed. That letter was thrown away, witness having no idea at the time that this controversy would arise. In the fall before J. L. Stacy died he visited witness and his mother in California. At that time, after recounting his discouragements under which he

had labored in getting a start, he wanted to turn back the Green River place and all the other property he had been handling since witness left for California, including the Gleason property. Witness encouraged his son to go back, telling him that everything would turn out all right; that witness would back him and give him a chance. His son went back very much relieved, and told witness that he was ready to resume his work. At the time the purchase was made of the land in controversy, witness had an understanding with his son that the title should go in the name of his son, J. L. Stacy, but that the property should inure to the benefit of witness and his wife. Witness was not giving away his property during his lifetime. He had no idea of doing that, and often so stated to his boys. All proceeds from the Gleason place and the River place were managed in the same way by witness' son. When a final account was made for the year the whole place was included in it. Witness just let his boys use the money for both places.

Further along in his testimony witness stated that it was an express agreement between himself and son, J. L. Stacy, that the latter should hold the land in controversy in trust for witness; that agreement was not in writing, but grew out of the relation between the eldest son and his father trying to help his son start in life without giving him his property before his death. At one time, as shown by a letter to his mother, he wanted to quitclaim the particular property in controversy to witness, but witness told him to keep it; and then, at the time when he was in extreme difficulty, he wanted to turn it all back, as witness presumed, because he did not want the estate to be jeopardized. Witness did not accept it. The son, J. L. Stacy, paid all the taxes and interest up to the time of his death.

On being recalled, witness further testified that when his son, J. L. Stacy, made a contract with Mrs. Gleason to purchase her dower interest in the property, he wired his son to purchase all of the interest. Witness paid on the purchase price the sum of $3,000. Besides this, he

introduced three checks amounting to $1,400. If witness
paid any other money on that place he did not have rec-
ord of it, but he instructed his son to put it in a farm
loan. The balance due of thirty-odd hundred dollars came
due in October or November, 1922, and J. L. Stacy con-
summated the loan on December 1, 1922, and witness was
sure that he applied that money on the payment of the
purchase price, because that was witness' instruction.
A deed from W. B. Rhodes, curator of the minor chil-
dren of Gleason, was introduced, showing that the lands
were purchased from the curator for the total considera-
tion of $5,000, $1,683.34 in cash, and the balance due Octo-
ber 15, 1922, evidenced by note.

Mrs. Lizzie Harvey Stacy testified that she was
named as one of the plaintiffs in the cause, and was the
wife of E. A. Stacy, the other plaintiff, and the mother
of J. L. Stacy, deceased. She lives at Piedmont, Cali-
fornia. She identified a letter which she received from
her son, J. L. Stacy, about June 2, 1923, written from
Dell, Arkansas. She stated that she owned a half inter-
est in the lands in controversy. Her son, J. L. Stacy,
bought it for his father and witness. Witness knew that
J. L. Stacy wrote to his father in regard to buying the
place for them. The place was bought by J. L. Stacy
through the instructions of her husband, E. A. Stacy, Sr.
It was not the intention of witness or E. A. Stacy, Sr.,
to permit J. L. Stacy to keep the place for himself, and
J. L. Stacy did not invest his own money in it. Witness
and her son, J. L. Stacy, did not consider that the Glea-
son place belonged to J. L. Stacy. The letter which
witness identified was introduced in evidence. It is too
long and would unduly extend this opinion to set
it forth, and we deem it unnecessary to do so. That
portion of the letter relevant here is the following
excerpt: "When I bought the Gleason place, I wrote
Father that, while I was buying in my name, I would make
out a quitclaim deed to him, just as soon as the sale was
cleared up. He wrote me back to keep it in my name,
and since that time I have invested some of my own

money in it. In case he should want his money out of that, with interest, I feel confident that I could sell it tomorrow and get it for him.''

The trial court found that the land in controversy was purchased with the funds of plaintiffs by J. L. Stacy and that the legal title was taken in the name of J. L. Stacy; that the beneficial title to the land belongs to the plaintiffs, who paid the consideration therefor. The court thereupon entered its decree divesting the defendants of all right, title and interest in the land, and vesting the same in the plaintiffs. From that decree is this appeal.

1. It is first contended by learned counsel for appellants that Mrs. Lizzie Harvey Stacy is not a party to this action, and that her testimony was therefore incompetent, and that the letter above mentioned, which she identified and which was introduced in evidence, was also incompetent. There is no merit in this contention. The transcript of the record wherein the pleadings are set forth contains a pleading which was filed by the clerk of the chancery court of Crittenden County, February 10, 1926, which is as follows:

''Come now the plaintiffs, and would respectfully show to the court that Lizzie Harvey Stacy is the owner of an undivided one-half interest in and to the property described in the original complaint filed herein by E. A. Stacy, Sr.; that the plaintiff, E. A. Stacy, Sr., as the agent of said Lizzie Harvey Stacy, managed and controlled her interest and the money with which the interest in said land was purchased, and in fact carried on all the negotiations, in so far as same pertained to the interest of the plaintiff, Lizzie Harvey Stacy, and the plaintiff, Lizzie Harvey Stacy, hereby adopts the original complaint filed by plaintiff, E. A. Stacy, Sr., as her complaint. The plaintiff, E. A. Stacy, Sr., by leave of court first had and obtained, amends his original complaint herein filed by making Lizzie Harvey Stacy a party thereto.''

The record shows that, on the 9th day of January, 1926, the deposition of E. A. Stacy, Sr., was taken by

consent. While the original deposition appears to have been taken on that day by agreement of counsel for all the parties, the certificate of the notary shows that thereafter, on the 2d day of March, 1926, certain exhibits called for by certain questions in the original deposition were added to the deposition. Thereafter, on the 8th of March, 1926, the deposition of Mrs. E. A. Stacy was likewise taken by agreement of all the parties. These depositions were styled "E. A. Stacy, Sr., and Lizzie Harvey Stacy, plaintiffs, v. Zoe D. Stacy, John Latham Stacy, Jr., Rose Elizabeth Stacy, Jean Stacy and Allen Dodson Stacy, defendants," and were filed in that cause on October 18, 1926. The decree is styled in the same manner as the depositions, and it recites that the cause came on to be heard at the October term of the court, plaintiffs being present by their attorney, and defendants being present by their respective attorneys. While there was no formal order entered of record showing that Mrs. Lizzie Harvey Stacy was made a party plaintiff, yet the above record entries clearly show that the court and the parties treated her as a party plaintiff. These entries are as conclusive of the fact that the original complaint was amended to make her a party plaintiff and that she adopted the original allegations of the complaint in asking the relief prayed therein as if there had been a record entry showing a formal order of the court making her a party plaintiff. Such formal order was not essential to her becoming a party plaintiff in the cause when the orders and recitals of the record show that she did, in fact, by consent of the court and parties, become a party plaintiff. After the deposition of E. A. Stacy, Sr., disclosed the fact that his wife owned a half interest in the purchase money, which, according to his testimony, was furnished to J. L. Stacy to purchase the land in controversy, it was essential that she be made a party, and the court and the parties very properly treated her as one of the necessary parties plaintiff to the action. See §§ 1089, 1101, 1102, and 1239, C. & M. Digest. The making of her a party plaintiff did not

change substantially the cause of action, but only confirmed the facts proved. See § 1239, C. & M. Digest; also *Bloom* v. *Home Insurance Agency,* 91 Ark. 367, 121 S. W. 293; *Rucker* v. *Martin,* 94 Ark. 365, 126 S. W. 1062; *Citizens' Fire Ins. Co.* v. *Lord,* 100 Ark. 212, 139 S. W. 1114; *Oak Leaf Mill Co.* v. *Cooper,* 103 Ark. 79, 146 S. W. 130. Since Mrs. Stacy was a party plaintiff, her testimony was competent, and likewise the letter from J. L. Stacy to her concerning the purchase of the land in controversy.

2. The complaint alleged that J. L. Stacy purchased the land in controversy in his own name and that E. A. Stacy, Sr., furnished the cash payment and became liable for the deferred payments, with the understanding that J. L. Stacy should hold the legal title to the property for the use and benefit of E. A. Stacy, Sr. The above allegation would justify the introduction of testimony to prove either an express or an implied trust. To establish an express trust it was necessary for the appellees to show that J. L. Stacy, before or at the time he purchased the property, and before or at the time the deed thereto was executed and delivered to him, had executed some writing declaring that he held the property in trust for the appellees. This the appellees have wholly failed to do.

Our statute, § 4867 of C. & M. Digest, provides: "All declarations or creations of trusts or confidences of any lands or tenements shall be manifested and proved by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void," etc. We find no proof whatever in the record of an express trust.

The next question is whether or not the appellees have proved that J. L. Stacy held the land in controversy under an implied trust, which term includes constructive trusts, or trusts *ex maleficio,* and resulting trusts. These implied trusts, which arise or result by implication of law, may be proved by oral testimony. Section 4868, C. & M. Digest; *Bray* v. *Timms,* 162 Ark. 247, 271 and

272, 258 S. W. 338. In the above case, at page 271, we approved Mr. Pomeroy's definition of a resulting trust as follows:

"Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent, in theory of equity, appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such case a trust results in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner."

And on page 274 (258 S. W. 346) we further said, quoting from the learned author: "Second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose, as, for example, the promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like, and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement."

Now, the excerpt from the letter which we have set forth shows conclusively that J. L. Stacy, in buying the property in his own name, did not do so with the intention of holding the same against the appellees; but, on the contrary, he expressly recognized that his father was entitled to a quitclaim deed to the property. At no time prior to his death did J. L. Stacy express any desire or intention to hold the property against his father's wishes. Therefore we would not be warranted, under any view of the evidence, in concluding that J. L. Stacy was hold-

ing the property as a trustee *ex maleficio.* The proof exonerates him entirely from even the slightest imputation of firaud in acquiring the property in his own name instead of that of his father.

Having reached the conclusion that there is no testimony to establish an express trust and none to establish a constructive trust, the only remaining question is whether or not the appellees have established a resulting trust in their favor to the land in controversy. In *Murchison* v. *Murchison,* 156 Ark. 403-407, 246 S. W. 499, 500, we said: ''While it is necessary that the proof to establish a resulting trust should be clear, satisfactory and convincing, it is not essential that it be undisputed.'' In *Reaves* v. *Reaves,* 165 Ark. 505, 264 S. W. 979, we held, quoting syllabus: ''In order to constitute a resulting trust, the purchase money or a specified part of it must be paid by another, or secured by another at the same time or previously to the purchase, and must be a part of that transaction.''

We have set forth all the salient features of the testimony, and it could serve no useful purpose to review the same in detail, by way of argument, to sustain the conclusion reached. Let it suffice to say we are convinced that the only reasonable conclusion that can be drawn from the testimony is that J. L. Stacy purchased the land in controversy under the direction, and acting as the agent, of his father and mother; they furnished the money to make the necessary original cash payment of the purchase price, and the place itself was mortgaged for the balance of the purchase money. The negotiations were conducted through J. L. Stacy because he was on the ground and they were in California, and the contract for the deed and purchase were made in his name because of convenience, and because it was their purpose that the property in controversy, together with 900 acres, designated as the ''River Place,'' should go to J. L. Stacy by will, or inheritance, as his part of their estate. All this is fully and clearly explained by the testimony of E. A. Stacy, Sr. The excerpt from the let-

ter of J. L. Stacy to his mother concerning the purchase corroborates the testimony of his father, and, it occurs to us, shows conclusively that, when he purchased the property in controversy, he did so for his father and mother.

In *Holland* v. *Bonner,* 142 Ark. 214-222, 218 S. W. 665, 667, 26 A. L. R. 1101, we said: ''An advancement is a gift by a parent to a child in anticipation of that which it is supposed the child will be entitled to on the death of the parent. The question as to whether or not a conveyance or transfer of money or property is regarded as a simple gift, or advancement, or a sale, is to be determined by the intention of the parent. The question as to what was the intention is generally purely one of fact to be ascertained from the circumstances of the transaction. The donor's intention is the controlling principle, and, if it can be said from all the circumstances surrounding a particular case that the parent intended a transfer of property to a child to represent a portion of the child's supposed share in the parent's estate, such transfer will be treated in law as an advancement. Conversely, if it appears that the ancestor intended that a gift to his child should not be treated as an advancement, such intention will prevail.'' See authorities there cited.

''A complete advancement is an irrevocable gift, and once it has been made the donor has no right or power to revoke the same.'' 1 R. C. L. § 1, page 653; § 29, page 672.

Now, at the time the deed was executed to the land in controversy the same evidenced either a gift outright or a gift by way of advancement to J. L. Stacy. Although the appellees may not have known at the time the deed was executed that title was being taken in the name of J. L. Stacy, yet they were afterwards informed thereof, as appears from J. L. Stacy's letter to his mother, and, when he proposed to make a quitclaim deed to his father, he was told by his father to keep the title in his name. Therefore the transaction was tantamount to a purchase of the land by E. A. Stacy and wife and

direction by them that the deed should be made in the name of J. L. Stacy. The purchase, under these circumstances, raised the presumption of an advancement. *Robinson* v. *Robinson,* 45 Ark. 481; *Bogey* v. *Roberts,* 48 Ark. 17, 2 S. W. 186, 3 Am. St. Rep. 211; *Chambers* v. *Michael,* 71 Ark. 374, 74 S. W. 516; *Poole* v. *Oliver,* 89 Ark. 580, 117 S. W. 747; *Doyle* v. *Davis,* 127 Ark. 302, 192 S. W. 229. But it occurs to us that this presumption is overcome by the undisputed proof in this case of facts existing before and at the time of the execution of the deed and so soon thereafter as to form a part of the transaction, which facts show that it was not the intention of the parents to give their son, J. L. Stacy, an absolute title to the property in controversy by way of advancement. The only proof in the record is by the testimony of the parents and the excerpt from the letter of J. L. Stacy to his mother. Bottomed alone upon this, as already stated, it seems to us it is impossible to escape the conclusion that the deed to the land in controversy was intended by the parents not as a gift by way of advancement to their son, but as creating a resulting trust to him for their benefit. It is clear beyond reasonable controversy, we believe, that it was not the intention of Mr. and Mrs. Stacy to place the irrevocable title to the Gleason place, the land in controversy, in their son, J. L. Stacy, any more than it was their intention to so place the River place. It was their intention that he should have the Gleason place and also the River place by way of a will, or inheritance, but not as an irrevocable gift during their lifetime. J. L. Stacy himself, in the excerpt from his letter to his mother, clearly recognized the fact that his parents would be entitled to a quitclaim deed from him to the land in controversy at that time. And that is certainly the only conclusion to be reached from the testimony of his parents.

3.   The appellants contend that the appellees are estopped from maintaining the action. But neither the pleadings nor proof justify this contention. The appellants predicate this contention upon the statement con-

tained in the letter of J. L. Stacy to his mother, to the effect that, after writing his father that he would make a quitclaim deed to him as soon as the sale was cleared up, his father replied, telling him to keep the place in his name, and that, since that time, he had invested some of his own money in the place. This testimony is entirely too indefinite and uncertain to warrant the court in declaring that the appellees are estopped from maintaining their action. There is nothing to show the amount of money J. L. Stacy spent, and nothing to show that it was spent in the belief that his parents had made him an irrevocable gift of the place in controversy; and nothing to show that whatever money he did spend on the Gleason place was with the assurance from them that the place was his own. The fact that he stated that he was ready to sell the place if his father wanted his money tends strongly to prove that he recognized his parents' right to the beneficial control of the property, and that he was ready to sell if they so desired.

The decree is therefore correct, and it is affirmed.