CLARK *v.* CLARK.

4-4002

Opinion delivered October 21, 1935.

*John W. Nance,* for appellants, Ashley Clark *et ux.*
*Duty & Duty, John Mayes* and *Bernal Seamster,* for appellee, W. T. Clark.

HUMPHREYS, J. The appellants in this case are the father and mother of appellee, who has also prosecuted a cross-appeal. About the year 1908, appellee, who was a young man living with them in the home owned by them near Goshen in Washington County, known as the Mayes place, went to California, to work in the oil fields. After arriving in California he obtained employment at a wage of $6 a day with room and board. His mother wrote him that the Slaughter property near their home was for sale at a bargain, and that his father wanted to buy it but did not have the money to do so. At that time appellants owed a considerable sum on the Mayes place. Appellee, who was a young unmarried man, wrote his mother to tell his father to buy the Slaughter farm and that he would help pay for it. The property was purchased mostly on credit for $3,000. Appellants moved upon it, and, according to the testimony of Mrs. Ashley Clark, her son sent them from time to time $2,200, which was applied on the payment of the purchase money. The balance of the purchase money or $800 was paid by them out of the proceeds from the two farms. Although appellee testified that he sent enough money to them to pay the entire consideration, his mother produced a record

which she had kept of all remittances, and they totaled $2,200. When the full consideration of $3,000 and interest had been paid to Slaughter in 1913, Ashley Clark took a deed to the Slaughter tract of 155 acres to himself, which he handed to his wife, Mrs. Ashley Clark, for safe-keeping and never recorded same nor informed appellee to whom the deed was made. Appellants continued to reside upon the place until appellee returned from the World War and purchased another farm from Ellery Clark. He had continued to work and save his money until he enlisted as a soldier. After returning from the war he procured employment in the oil fields of Oklahoma at $18 per day and, during that time, Ashley Clark, his father, purchased the Ellery Clark farm near Goshen for him, agreeing to pay therefor the sum of $16,000. Appellee paid $9,800 of the indebtedness and appellants paid $1,200 out of the proceeds which had been received from the Slaughter and Mayes farms and appellee and his father executed a note to Ellery Clark for $5,000, evidencing the balance of the purchase money. The deed to the Ellery Clark farm was taken in the name of appellee and handed to Mrs. Ashley Clark, who put same with the deed to the Slaughter farm, and it was never recorded. Appellants then moved to the Ellery Clark farm and operated these farms, never keeping or rendering any account to appellee. Appellee then moved to California and procured work in the oil fields at $18 a day. The $5,000 note representing the balance due on the Ellery Clark farm was paid in part by proceeds from all the farms, which were looked after and operated by appellants. About two-thirds of the amount was paid by appellee in remittances from California. Appellee returned to Goshen in the fall of 1922 and having married moved upon the Slaughter farm without attorning to appellants for the proceeds derived therefrom. When he returned, cattle were sold off the Ellery Clark farm for $480, which was received by appellee. Some time in the summer of 1923, appellee went back to California and did not return until 1930, at which time he took charge of both the Slaughter and Ellery Clark farms and all the personal property and operated and received all the

proceeds therefrom. During his absence, appellants bought another small farm adjoining the Slaughter farm, where they moved after appellee's return from California. Ashley Clark, from 1923 until 1930, had operated the farms without keeping any account of what was purchased and sold and without accounting to appellee in any manner. In the meantime, he had accumulated four or five thousand dollars and deposited same in a Fayetteville bank in his own name. After taking charge of both the Slaughter and Ellery Clark farms and all the personal property, a large part of which appellee had purchased, Mrs. Ashley Clark handed appellee the deed to the Ellery Clark farm, and, when asked about the deed to the Slaughter farm, she replied that she had it, but that appellee's father did not want her to deliver that deed to him. Shortly thereafter the money deposited in the Fayetteville bank came up for discussion, and two checks, one for $500 and one for $1,000 were given to appellee by his father, Ashley Clark, and the amount of $1,500 was transferred from Ashley Clark's deposit account to the individual deposit account of appellee. When appellee began to check on his personal account, payment of the checks was refused, and when he inquired into the matter, the bank informed him that his father had requested it to transfer the money back to his own account, which it had done. When appellee requested his father, Ashley Clark, to explain why he had stopped payment on the checks, he told him that $1,500 was too much money for him to have and handed him a check for $1,000. This check was cashed and used by appellee. Ashley Clark testified that he loaned appellee the $1,000 and appellee testified that it was not a loan but a gift to him. Nothing more was said or done about the matter until this suit was instituted by appellee to have the title to the Slaughter farm vested in him, and for an accounting of the rents and profits which his father had derived from it.

Appellants interposed the defenses that appellee had made a gift to them of a part of the money which they used to purchase the Slaughter farm, and, if not a gift,

they had acquired title thereto by more than seven years' adverse possession.

The chancery court rendered a decree vesting twenty-two-thirtieths interest in the Slaughter farm in appellee and eight-thirtieths in appellants. He did this on the theory that appellee had not made a gift to his father in money of the $2,200 he remitted to them to buy the farm, and that the law raised a resulting trust in the real estate in favor of appellee to the extent his money was used in the purchase thereof and also rendered a judgment against appellee for the $1,000 he received from his father upon his return from California. Both parties have appealed from the decree in so far as the decree is adverse to the claims of each.

The court correctly found that the $2,200 was not a gift by appellee to appellants. It is undisputed that the mother kept a record of each remittance made to them covering a period of three or four years. Had these remittances been intended as gifts, it was not necessary to have kept a book record of them; whereas, if they had been sent to pay for all or a part of the farm, a record of them would be a natural thing to keep. Again, it is also undisputed that the proceeds derived from the Slaughter farm were used in payment of part of the purchase price of the Ellery Clark farm, conceded to be the property of appellee. Again, it is admitted that the possession of the Slaughter farm was turned over to appellee when he returned in both 1922 and 1930 without any claim to it whatever by appellants. These acts on the part of appellants are wholly inconsistent with the claim that the property was a gift to them by appellee.

It is quite apparent that the remittances were not loans by appellee to appellants. In fact, no such claim was made by them. Not being a gift or loan, the only other construction that can be placed upon the acts and conduct of the parties is that appellee's money was used by his father, Ashley Clark, together with a part of his own in the purchase of the Slaughter farm, and the title was taken in the father's name for the benefit of both of them. The general rule laid down in 39 Cyc. 142, is, that "where the purchase price for lands belongs to a

son or daughter of the purchaser, and the purchaser takes title thereto in his own name, a resulting trust arises, in the absence of circumstances showing a contrary intent, in favor of such son and daughter, and where the payment of a child's funds is only a part of the consideration, a resulting trust *pro tanto* arises in his favor, provided it is for some definite aliquot part of the whole consideration." This rule is particularly applicable to the facts and circumstances in the instant case. The fact that appellants moved onto and resided on the Slaughter farm for a long period of time and paid the taxes thereon does not prevent the application of the rule, for their possession and payment of taxes is reasonably attributable to their habit of looking after and managing their son's business affairs in his absence from the State. They did or said nothing to any one indicating that they were holding and occupying the Slaughter farm adversely to appellee. They did not even record the deed that the world might know that the legal title was in them. In fact the appellee never saw the deed until it was introduced in evidence in this case.

Appellants contend that they have acquired title by seven years' adverse possession. The statute of limitations does not bar a trust unless the circumstances raise a presumption of the extinguishment of the trust or unless there has been an open denial or repudiation of the trust. Neither is shown by the evidence in this case. Appellee's right has not been cut off by the statute of limitations or laches.

Appellants also contend that the court erred in refusing to adjust equities in the personal property. We think not, for according to the evidence all the personal property was willingly delivered to appellee by appellants when he returned in 1930. Even if it had not been turned over to him upon his return, the weight of the evidence is to the effect that it all belonged to him.

Appellee contends that the court erred in giving appellants a judgment against him for the $1,000 his father let him have in 1930 when he returned from California. His contention is that it was a gift to him by his father, but we are unable to say under the conflicting

evidence that the finding of the chancellor is against a clear preponderance of the evidence.

No error appearing, the decree is affirmed.