Harbour *v.* Harbour.

4-7410                                                     181 S. W. 2d 805

Opinion delivered July 10, 1944.

552

*Wils Davis* and *W. H. Fisher*, for appellant.

*John A. Fogleman* and *James C. Hale*, for appellee.

McFADDIN, J. This appeal necessitates the determination of whether a resulting trust exists in real estate, and also whether limitations, laches, or estoppel bar the enforcement of the trust.

Miss Lorine Lumpkin worked in a bank in Marion, Arkansas, as teller and bookkeeper; and Dr. Otis Harbour was a veterinarian, residing in Marion, Arkansas, but engaged in the practice of his work in Memphis, Tennessee. When they married in February, 1930, she was thirty years of age and he was forty years of age. They lived together as husband and wife until 1942. We will hereafter refer to them as Mrs. Harbour and Dr. Harbour.

At the time of the marriage Dr. Harbour had no property. He had his employment in the stock yards in Memphis (from which he was paid on a basis of services performed), and had a bank account of $291.80; but owed a balance on the engagement or wedding ring. Mrs. Harbour had her position in the bank at Marion (at a salary of $150 per month); owned $500 in bank stock (that paid dividends until after 1936); received fees as notary public (that amounted to as much as $161 at the time of one deposit); owned a house (in Lawrenceburg, Tennessee) from which she regularly received rents varying from $18.50 to $25 per month; and had a bank account of $250 at the time of the marriage; and she owed no debts. So, to the marriage partnership Dr. Harbour brought only the expectancy of earnings, but Mrs. Harbour brought the dowry.

Mrs. Harbour continued to work in the bank until after 1936 and her salary was increased to $175 per month sometime about 1934. She was in charge of all of the deposits and accounts in the bank. Since Mrs. Harbour worked in the bank Dr. Harbour entrusted to her the depositing of his money and the making of various bank accounts; and in the period of time from 1932 to 1936 they had six bank accounts being:

(1) Otis Harbour (a regular checking account on which each party wrote checks).

(2) Otis Harbour, savings account (which was closed out and became the Otis Harbour special account).

(3) Otis. Harbour, special account (which was used in lieu of the savings account).

(4) Otis Harbour, farm account (in which rents were deposited and from which advances were made to tenants, and in which the rents from the tenants were deposited).

(5) Lorine Harbour, checking account (her personal checking account).

(6) Lorine Harbour, savings account (her personal savings account).

Some of these accounts were opened at different times, but each plays a part in the story. The principal account was the Otis Harbour checking account. In 1934, the parties decided to buy a farm and they looked for a good investment, and soon located the splendid farm of 196.15 acres here involved, and then being sold by the Tennessee Joint Stock Land Bank at a distress price. The deed was taken in the name of Dr. Otis Harbour. The total purchase price was agreed to be $13,730.50. On March 26, 1934, Dr. Harbour paid $1,000 earnest money (by check on Otis Harbour checking account), and signed a contract to pay $2,730.50 in cash and to execute notes totaling $10,000 whenever the title could be delivered. The purchasers were to receive the 1934 rents. On October 15, 1934, the title was approved, and Dr. Harbour paid the $2,730.50 (by a check on the Otis

Harbour checking account), and executed the notes totaling $10,000. These notes were secured by purchase money mortgages on the land. Mrs. Harbour signed the mortgages, but did not sign the notes, and did not in any way become personally liable for the payment of the $10,000. The notes were paid on or before March 30, 1936, and all the payments were from the Otis Harbour checking account.

Financial fortune smiled on the Harbours because each was energetic and thrifty; and a prosperous and happy married life could have easily resulted; but it did not. They separated in 1942 in Memphis; and Mrs. Harbour has pending, in Tennessee, a suit for divorce and alimony. We here point out that the divorce action between the parties is pending in another state, and that this case concerns only the alleged trust property in Arkansas. No question was raised in the lower court, or here, as to jurisdiction in this case; and since the "res" (land) is in Arkansas, and since the parties have come into the Arkansas courts, we proceed to adjudicate the case on its merits. Leflar on Conflict of Laws, §§ 26, 36 and 118.

In 1943, Mrs. Harbour filed this suit to have a trust declared in her favor for an undivided one-half interest in the lands and for partition to segregate her interest. Dr. Harbour denied any trust, and pleaded limitations, laches, estoppel and the statute of frauds. The trial court found for Mrs. Harbour and decreed her to be the equitable owner of an undivided one-half interest in the lands, and appointed commissioners to make partition; and from that decree Dr. Harbour has appealed. The record is voluminous and the exhibits are numerous and detailed; but through it all, there is the wife's contention that she is entitled to one-half of the land in fee, and there is the husband's denial of the asserted claim.

To sustain the decree of the chancery court, appellee claims:

(1) That the money which paid for the land was from a "joint account," and therefore the title was

joint in equity; and (2) if this court should hold against the "joint account" theory, then, to the extent that the money of the wife went into the purchase of the land—to that extent, at all events—the wife is entitled to a beneficial trust interest in the land. We proceed to an examination of these contentions as well as the other questions in the case.

### I. *"Joint Account" Theory*

Mrs. Harbour claims that the Otis Harbour checking account was a "joint account" owned equally by Dr. Harbour and herself; and that since all the checks, which paid for the farm, were drawn on the "joint account" therefore she is the owner of one-half interest in the farm. This "joint account" theory cannot be sustained as that term is used in the statutes, cases, and books on banks and banking. The Arkansas statute on "joint accounts" is § 727a of Pope's Digest, and it is predicated on the fact that the deposit shall be made "in the name of such depositor and other person." Our statute presupposes that a "joint account" will be a two-name account. This statute was discussed by this court in *Black* v. *Black,* 199 Ark. 609, 135 S. W. 2d 837. In the case of *Ferrel, Administratrix,* v. *Holland,* 205 Ark. 523, 169 S. W. 2d 643, there was involved the "joint account" in building and loan certificates. In 7 Am. J. 299, there is a discussion of joint deposits and accounts; and the discussion begins with the assertion: "Bank accounts may be established in the name of two or more persons." To the same effect see 9 C. J. S. 595. The basic legal conception of a "joint account" means that it be in two or more names. That essential does not exist in the account here involved, since the account stood only in the name of Otis Harbour.

But Mrs. Harbour contends that it was agreed between herself and Dr. Harbour that she was to have an undivided half interest in the account regardless of the name in which it stood. In other words, she contends that even if it was not a "joint account" as regards the bank, still it was a "joint account" as between husband

and wife. The obvious counter-question as to this contention is: if the account was joint between the parties, and if all of their resources were to be pooled and owned "fifty fifty," then why did they have so many different accounts? Mrs. Harbour worked in the bank and had charge of all the deposits and accounts in the bank. As a bank teller and bookkeeper, she certainly knew that to make a "joint account" so far as the bank was concerned, there would have to be two named persons. She wrote most of the bank deposit slips where the funds were deposited to the Otis Harbour checking account. She had a separate checking account of her own and also a separate savings account. This shows that Mrs. Harbour knew of the distinction in accounts, and that all of the income of husband and wife was not pooled into the Otis Harbour checking account. If she and Dr. Harbour had intended that the Otis Harbour checking account was to be a "joint account," as that term is used in the statute, then she owed it to the bank, of which she was an employee and stockholder, to post the account as "Otis and Lorine Harbour," so that the bank would know that it was a "joint account"; this she did not do. Dr. Harbour admitted that his wife could write checks on his account at any time, but insisted that it was not a "joint account." Mrs. Harbour said that they agreed that it was a "joint venture." Thus, only the two interested parties testified as to this angle of the case; and the actual bank records, and Mrs. Harbour's conduct show conclusively that this was not a "joint account" in law or in fact. The chancery court adopted the "joint account" theory, and on that theory rendered a decree awarding Mrs. Harbour one-half interest in the lands. This decree was erroneous.

## II. The "Trust" Theory

Mrs. Harbour next claims an equitable interest in the land by reason of a resulting trust: that is, she says it was agreed between herself and Dr. Harbour that her money was to go into the Otis Harbour checking account; and that they would buy a farm and pay for it from that account; and that to the extent that her money actually

went into the purchase price of the farm—then—to that extent—she is entitled to a beneficial interest in the land as a resulting trust. There is merit to this contention.

Of course, no express trust can be claimed by Mrs. Harbour because there was no instrument in writing declaring an express trust, and § 6064 of Pope's Digest prevents an express trust being shown by parol testimony. But there are other trusts that may be shown by parol testimony. In Pomeroy's Equity Jurisprudence, 3rd Ed., § 987, in stating the classification of trusts, it is said:

"All possible trusts, whether of real or personal property, are separated by principal line of division into two great classes:

"(1) Those created by the intentional act of some party . . . which are called express trusts;·

"(2) Those created by operation of law . . . — implied, or resulting, and constructive trusts."

Section 6065 of Pope's Digest removes resulting, implied and constructive trusts from the statute of frauds and allows oral testimony to be admitted to prove these. *McGuire* v. *Ramsey,* 9 Ark. 518; *Richardson* v. *Taylor,* 45 Ark. 472; *Camden* v. *Bennett,* 64 Ark. 155, 41 S. W. 854; *Grayson* v. *Bowlin,* 70 Ark. 145, 66 S. W. 658; *Crosby* v. *Henry,* 76 Ark. 615, 88 S. W. 949. In *Bray* v. *Timms,* 162 Ark. 247, 258 S. W. 338, in stating that parol evidence might be introduced to show a trust by operation of law, we said: "Were the rule otherwise, a statute which was intended to prevent fraud would, in many cases, be a potent instrument of fraud."

So, with the parol evidence before us we proceed to see if the resulting trust was shown. In *Spradling* v. *Spradling,* 101 Ark. 451, 142 S. W. 848, we said: "When land is purchased in the name of one person, and the consideration is paid by another, or where the title to land, inherited by one, is placed in the name of another, it is an established rule of equity that a trust in favor of the true and beneficial owner arises which a court of

chancery will declare and enforce against the person in whom the dry legal title alone rests. But a determination of the question as to whether or not such trust results from the transaction depends entirely upon the intention of the parties themselves.''

In *Kerby* v. *Feild,* 183 Ark. 714, 38 S. W. 2d 308, Ch. J. HART said: ''In order to constitute a resulting trust, the purchase money or a specified part of it must have been paid by another or secured by another at the same time, or previously to the purchase, and must be a part of the transaction. In other words, the trust results from the original transaction at the time it takes place and at no other time, and it is founded upon the actual payment of money and upon no other ground. *Red Bud Realty Co.* v. *South,* 96 Ark. 281, 131 S. W. 340, and *Reeves* v. *Reeves,* 165 Ark. 505, 264 S. W. 979. This rule is so well settled in this state that no further citation of authorities to support it or reasons for its adoption need be discussed.''

The case of *Kline* v. *Ragland,* 47 Ark. 111, 14 S. W. 474, affords strong support for Mrs. Harbour. In that case the title was taken in the husband's name and he alone signed the notes for the deferred purchase price. Nevertheless, to the extent that the wife's money went into the purchase price as agreed at the time of fixing the title, to that extent, the husband was held to be a trustee for her. So, here, Mrs. Harbour may show by oral testimony that her money went into the original purchase price and subsequent payments under an agreement, prior to the fixing of the legal title, that she was to have a beneficial interest in the lands; and a resulting trust to that extent should be decreed for her. There is a wealth of cases from our own court on trusts each with some facts somewhat similar to, and some facts somewhat different from, the case at bar. Some of these cases are: *Watson* v. *Murray,* 54 Ark. 499, 16 S. W. 293; *Castleberry* v. *Castleberry,* 202 Ark. 1039, 155 S. W. 2d 44; *Lisko* v. *Hicks,* 195 Ark. 705, 144 S. W. 2d 9; *Clark* v. *Clark,* 191 Ark. 461, 86 S. W. 2d 937; *Hunt* v. *Hunt,* 202 Ark. 130, 149 S. W. 2d 930; *Stacy* v. *Stacy,* 175 Ark. 763,

300 S. W. 437; *Milner* v. *Freeman,* 40 Ark. 62. For general statements, see: 65 C. J. 71, 397 and 414; 26 R. C. L. 1214, 1219, 1222, 1224, 1229; and annotation in 38 Ann. Cas. 625.

Of course, the trust must be established by evidence that is clear, cogent and convincing. *Stacy* v. *Stacy,* 175 Ark. 763, 300 S. W. 437; *Kerby* v. *Field,* 183 Ark. 714, 38 S. W. 2d 308; 65 C. J. 440. But the evidence on behalf of Mrs. Harbour meets that test. She testified that shortly after the marriage she began putting her salary in the Otis Harbour checking account, because it was so agreed, and because Dr. Harbour thought it would be better, as he wanted the money in his name; that they both wanted the farm, and agreed on its purchase, and they made the payments out of the Otis Harbour account; that funds of both of them paid for the farm; that the title was put in Dr. Harbour's name because he wanted it that way, but that it was agreed that it was to be theirs together, and was to be their home, and he always called it "our place"; that she would not demand that the legal title be jointly shown, because the ownership was understood between them in advance, and she had the utmost confidence in Otis Harbour. They each made a will leaving all to the survivor. The title letter of the attorney who approved the title was addressed to "Dr. and Mrs. Otis Harbour." A. J. Lumpkin (brother of Mrs. Harbour) testified that many times, both before and after the purchase of the farm, Dr. and Mrs. Harbour, in his presence, discussed buying the farm together; and that after the purchase of the farm Dr. Harbour always called it "our farm."

While Dr. Harbour testified that he had no intention of being a trustee for his wife, still his testimony affords great support, and only slight contradiction, if any, to the trust theory. Dr. Harbour refused to deny any part of the testimony of A. J. Lumpkin. Dr. Harbour admitted that he and his wife "might" have discussed between themselves the placing of her money in his name; he knew all the time that her money was going into his account, and when he wrote the checks to pay

for the farm he intended to use any funds that might be in his account; and he could not deny that some of her money actually went into the purchase of her farm. Finally he admitted that he and his wife looked at the farm together before it was purchased, and that they agreed to build their home on this land; and that, about the time of the purchase of the land they each made a will, leaving all to the survivor. There were other facts and circumstances in the record; and every fact and circumstance supports the contention of Mrs. Harbour that Dr. Harbour is a trustee for her benefit, to the extent that her money actually went into the purchase of the land. The evidence in this case justifies a finding that it was contemplated by both of the parties, at the time of the purchase of the land, that Mrs. Harbour should furnish part of the purchase money and should own an interest in the land corresponding to the share of the purchase money contributed by her at the time the land was bought and afterwards. This is a resulting trust.

It is true that in *Remshard* v. *Renshaw*, 102 Ark. 309, 143 S. W. 1092, and in *Gordon* v. *Claridy*, 142 Ark. 184, 218 S. W. 195, we held that where the wife's money did not purchase a definite interest or a determinative aliquot part of the property, we would declare a lien on all of the property to the amount of her funds going into the purchase, rather than to declare a resulting trust in the property for her to the amount that her funds bore to the net price of the property. But the rule of those cases does not apply here. In the Remshard case there was a mere loan by the wife. In the Gordon case, the proof showed that the new acquisition was made before the wife sold her lands, and before she had any money to invest; so she could not have made a payment antecedent to the vesting of title. In neither of those cases was there any agreement, antecedent to the vesting of title, that the wife was to have an interest in the lands; whereas, in the case at bar there was such an agreement and that agreement, with the other facts in the case, makes this a case of resulting trust. The case at bar is different from the ordinary case of a husband using his wife's money. Here the wife had a regular monthly in-

come in addition to other property; and there was (1) an agreement between the parties to mingle a portion of funds for investment, and (2) an investment actually made with the mingled funds in pursuance to the agreement made prior to the fixing of the title.

It is clear that Dr. Harbour could not have furnished all of the purchase price alone. The total purchase price was $13,730.50; and of this amount $12,730.50 together with interest, was paid in the period of time from October 24, 1934, to March 30, 1936. The rents for 1934 were $991.03 and for 1935 were (gross) $1,915.22. Copies of Dr. Harbour's State and Federal Income Tax Returns were introduced in evidence, and the figures therein are not denied by him. He did not have sufficient income to have paid for the farm. When we take these admitted figures, it is clear that some of his wife's money was used. Just how much of her money went into the purchase of the farm we are unable to determine without the services of an accountant; and that is a matter for the trial court. Since the chancery court did not decide the case on the resulting trust theory, but on the ''joint account'' theory, (as we have previously noted), we think the better practice in this case is to remand to the chancery court to decide on the record made, and any other evidence subsequently offered by either party, just how much of Mrs. Harbour's money went into the purchase of the farm.

Therefore we hold that to the extent that Mrs. Harbour's money went into the purchase of the farm, to that extent, Dr. Harbour was a trustee for her; and to the extent that his money went into the purchase of the farm he was, to that extent, a beneficial owner; and to the extent that the rents, and profits from the furnish account, and other income from the farm, went into the purchase money, the same should be proportioned between the parties as their respective capital investment stood at the times the rents and other items were received. Mrs. Harbour, of course, has the burden of proving the definite amount of her money that definitely

went into the purchase price of the place at the time each payment was made.

### III.  *Limitations, Laches and Estoppel*

Having found that a resulting trust exists, it remains only to consider these pleas made by Dr. Harbour against the enforcement of the trust. The evidence shows that after the trust arose Dr. Harbour continued to speak of the farm as "our farm"; that Mrs. Harbour wrote checks for the furnishings to the tenants and received and deposited the rents; and that until 1941 the rents and profits from the land were just as much under the control of Mrs. Harbour as under the control of Dr. Harbour; and that she was just as much in possession of the property as he was; so under these facts there was no repudiation by Dr. Harbour of Mrs. Harbour's beneficial interest in, and use of, the property.

As regards limitations, we find no merit in the plea. It is true that in *Board of Education* v. *Morgan*, 182 Ark. 1110, 34 S. W. 2d 1063, it was stated that the statute of limitations usually runs against implied, constructive and resulting trusts from the inception of the trust. But even in that case it was recognized that there were exceptions to such rule of limitations. The resulting trust here involved clearly falls within such an exception, even if resulting trusts may be said to be in the same category with implied and constructive trusts in regard to the statute of limitations. In 34 Am. J. 143, after stating that limitations runs against implied trusts and constructive trusts from the inception of the trust, the following is stated as regards resulting trusts:

"It is generally held, however, that the rule does not apply to a resulting trust which has every element that operates to take an express trust out of the statute and prevent it from running against the trust until after it has been effectually repudiated; and it has been declared that as long as there is a continuing and subsisting equitable trust acknowledged or acted upon by the parties, the statute of limitations does not apply, but if the trustee denies the right of his *cestui que trust,*

and the possession becomes adverse, lapse of time from that period may constitute a bar in equity. Thus, when a resulting trust arises from the purchase by a husband in his own name with his wife's money, it has been held that the statute of limitations begins to run in favor of the husband, and against the wife, at the time of the conveyance, if there is no recognition of the wife's rights; but if her rights are recognized, the statute of limitations begins to run in favor of the husband and against the wife at the time when the husband begins to hold adversely."

And to the same effect see 37 C. J. 908 where it is said:

". . . and the statute of limitations does not run in favor of the trustee of a resulting trust, which most frequently arises where one person pays the consideration for a purchase and title is taken in the name of another, until the trustee disavows the trust or asserts some right to the property inconsistent with it, and the *cestui que trust* has knowledge of such disavowal or assertion, or, from the circumstances, ought to have learned of it."

As regards laches: the same facts as first mentioned in this section defeat that plea made by Dr. Harbour. In 26 R. C. L. 1365, it is stated:

"Laches cannot be imputed to one who seeks to enforce a resulting trust in real property, where his right to use and possess the same has never been questioned, since his possession is notice to the world of all his rights. A *cestui que trust,* who avails himself of the proceeds of the fund of which he is the beneficiary according to the terms of a trust determinable at his pleasure, cannot be charged with laches because he does not avail himself of his additional right to bring the trust to an end. . . . The mere fact that a wife who furnishes the money to purchase real estate, the title to which is taken in the name of her husband, does not bring an action against him during his lifetime to compel a conveyance to herself, is not such laches as will

bar the action, where they live together upon the property and he repeatedly promises to convey the title to her.''

And in 65 C. J. 1027-8 in discussing laches in enforcing a resulting trust it is stated:

''. . . there may be no laches . . . as where, during the period of the delay, he, (the beneficiary), has been in possession, or joint possession with the trustee, of the property, or has been exercising acts of control and ownership over the property. Time does not commence to run against the beneficiary of a resulting trust, so as to render the doctrine of laches applicable, until the trustee disavows or repudiates the trust and such disavowal or repudiation is fully and unequivocally made known to the beneficiary.''

As regards estoppel: we find no facts justifying that plea by Dr. Harbour. No silence on the part of the wife caused any change of position by Dr. Harbour. *Watson* v. *Murray,* 54 Ark. 499, 16 S. W. 293; *Brownfield* v. *Bookout,* 147 Ark. 555, 228 S. W. 51; *Slaughter* v. *Cornie Stave Co.,* 172 Ark. 952, 291 S. W. 69; *Union Indemnity Co.* v. *Benton Lumber Co.,* 179 Ark. 752, 18 S. W. 2d 327.

For the reasons herein stated, the decree of the chancery court is reversed, and the cause remanded with directions to declare a resulting trust in the property for Mrs. Harbour and to fix the amount of her trust interest under the directions contained in this opinion, and for further proceedings not inconsistent with this opinion.

SMITH and HOLT, JJ., dissent.