4-5788 137 S. W. 2d 929

Opinion delivered February 19, 1940.

*Robert C. Knox, J. V. Spencer* and *Charles E. Wright,* for appellant.

*Mahoney & Yocum* and *J. S. Brooks,* for appellee.

Holt, J. Appellants bring this appeal from a decree of the Union chancery court, first division, in which their claim to a certain interest in land was denied and their complaint dismissed for want of equity.

The property involved is a two-thirds interest in a tract of land containing 208 acres.

The plaintiffs below were Hulette F. Nelson, the widow of J. Hansel Nelson, deceased, and three children, James Word Nelson, Mary Lillian Nelson and J. Hansel Nelson, Jr., by his mother and next friend, Hulette F. Nelson.

It is conceded by the parties that the interests, if any, of Mrs. Hulette F. Nelson and the oldest heir, James Word Nelson, who was twenty-six years of age at the time this suit was filed, are barred by the statute of limitations (§§ 8918 and 8924 of Pope's Digest) and, therefore, they pass out of this suit. The interests, if any, of Mary Lillian Nelson and J. Hansel Nelson, Jr., minors, remain for determination here.

Appellee, J. J. Wood, was the only defendant below.

Appellants alleged claim to the property as heirs at law of their father, J. Hansel Nelson, deceased.

Appellee, Wood, in his answer claimed the property by reason of a deed from Elmer Nelson, administrator of the estate of J. Hansel Nelson, deceased, dated January 3, 1928. He denied all the allegations of plaintiffs' complaint and among others set up the following defenses:

"The plaintiff, J. Word Nelson, inherited approximately $3,000 from his mother who died about 1912 or '13 and following the death of his mother, J. Hansel Nelson, Sr., was by the probate court of Union county, Arkansas, appointed guardian for said plaintiff, who was a minor at said time, and said inheritance was paid over in cash to said guardian. Said funds so received by said guardian for said ward were by said guardian invested for his ward in the purchase of the lands described in the complaint from................Muse and the deed was made to said guardian. Said guardian at all times recognized said lands as belonging to and the property of his ward, J. Word Nelson, and that he held the title thereto in trust for his said ward, and defendant alleges that in the purchase of said lands by said guardian a trust was created in said property for the benefit of the said J. Word Nelson, and that he was in fact the owner thereof and that J. Hansel Nelson, Sr., nor either of the plaintiffs, Hulette F. Nelson, Mary Lillian Nelson, or J. Hansel Nelson, have at any time owned any interest therein."

"Said lands were sold . . . for the support, maintenance and education of the plaintiff, J. Word Nelson," . . . and that the purchase price thereof, $2,-700, was paid to or for the account of the plaintiff, James

Word Nelson, and that he is estopped to attack the administrator's sale.

The material facts as reflected by this record are to the following effect:

J. Hansel Nelson, deceased, father of appellants, was married three times and one child was born to each of these marriages. The first wife, Stella Word Nelson, died in 1911 leaving one child, James Word Nelson. Appellants are children by subsequent marriages. J. Hansel Nelson was appointed guardian of his son, James Word Nelson, in 1911, after the death of his wife, Stella Word Nelson.

Stella Word Nelson was an heir of C. T. Word, whose estate had been administered in Lee county, Arkansas, by E. B. Word as administrator. Stella Word's share of this estate had not been paid to her at her death. In 1913, E. B. Word as administrator paid to J. Hansel Nelson for the benefit of, and as guardian of, James Word Nelson from Stella Word's share of the estate, a sum of money variously estimated up to $3,800, but the exact sum is in dispute. This sum, according to E. B. Word, was paid to J. Hansel Nelson, guardian, after Nelson had satisfied Word that he, Nelson, had been duly appointed guardian of James Word Nelson in Union county, Arkansas. The record reflects that there was deposited in the personal account of J. Hansel Nelson on February 25, 1913, the sum of $2,500 at Junction City, Arkansas.

There is evidence on the part of appellants that E. B. Word, who was also guardian of Stella Word in 1911, had paid over to Stella Word Nelson $1,737.39 prior to her death in full settlement of her claims under the various estates, and she had receipted E. B. Word therefor.

E. B. Word testified that Stella Word Nelson had left her inheritance with Word & Boone, a mercantile establishment of Marianna, Arkansas, to be drawn as needed. The exact amount due Stella Word Nelson at her death is not certain.

The record reflects that J. Hansel Nelson received at least $3,000 from E. B. Word as belonging to James

Word Nelson, the sole heir of Stella Word Nelson. This is shown by a number of reports made by J. Hansel Nelson, guardian of James Word Nelson, at intervals from 1914 to 1925 in which Nelson listed as the sole and only assets of said minor, the sum of $3,000 in money. This $3,000 with which J. Hansel Nelson, guardian, charged himself in his reports as belonging to James Word Nelson could not be found by Elmer Nelson, administrator of the estate of J. Hansel Nelson, deceased.

It is further in evidence that J. Hansel Nelson, after Stella Word Nelson died, consulted with E. B. Word relative to investing the money of his ward, James Word Nelson, which came to his ward by inheritance from Stella Word Nelson, his mother. J. Hansel Nelson expressed the intention to put this money into land and E. B. Word advised him that title would have to be taken in James Word Nelson or J. Hansel Nelson would have to qualify in the Union probate court as James Word Nelson's guardian. J. Hansel Nelson did qualify and was appointed guardian of James Word Nelson February 15, 1913, and Word paid this money over to him. On January 16, 1913, M. P. Muse, et al., grantors, conveyed by deed the property in question to J. Hansel Nelson, which deed was recorded April 2, 1913. J. Hansel Nelson retained the record title to these lands until the time of his death.

Mrs. P. E. Murphy testified that J. Hansel Nelson told her that his minor son, James Word Nelson, had money that "came from the boy's mother's estate." Another witness, S. L. Muse, one of the grantors in the deed to J. Hansel Nelson, testified that he received money "from the estate of his first wife—from Word's mother." Another witness, J. A. Nelson, testified that my brother, J. Hansel Nelson, told me she (Stella Word Nelson) did inherit some money from her father or mother.

And quoting from the abstract of the testimony as set out in appellants' brief: "On February 15, 1911, E. B. Word, guardian of Stella Word Nelson, took a receipt from her for $729.89 in full settlement of his guardianship, and on July 31, 1911, took a receipt from her

for $1,007.89 as her distributive share of the estate of her sister (Lena Word) who had died. These sums E. B. Word did not pay to her, but she left them a total of $1,737.29 in the assets of the firm of Word & Boone, subject to her withdrawal.

"Mrs. Murphy further testified that J. Hansel Nelson 'afterwards told me that he had bought the place for Word—had used Word's money in buying this farm for him—but could not say positively that this is the property.' S. L. Muse testified that J. Hansel Nelson 'said he was acquiring it for Stella's son, Word Nelson.' J. D. Barnes testified that at some unremembered time and place J. Hansel Nelson had 'remarked that he didn't buy the place to live on—he said he was investing his boy's money in it.' S. E. Nelson testified 'it was understood by me and all of the relatives that he bought this place for the boy.' J. A. Nelson testified that J. Hansel Nelson told him that with the 'inherited money' 'he bought a place—the McCorvey place. He bought it for Word so that, when he grew up, he would have a good farm—that is what he told me. Said he bought it for him.' E. B. Word testified that although J. Hansel Nelson had agreed to send to E. B. Word the deed, made out to James Word Nelson as grantee, he did not do so and 'as to how he paid for land I could not say one thing.'

"Mrs. Murphy further testified that if J. Hansel Nelson 'did have any money, or property, I never knew about it—he was just a clerk in the store' and 'if he ever did get into any deal where he made any money I never heard of it.' S. L. Muse testified that J. Hansel Nelson had worked for Muse Mercantile Company, the firm from whom he bought the land in question, for eight to ten years for a salary of at first $35 per month and then increased to $50 and then to $60 per month, and was so working for them in 1913; that Nelson then had a little farm, but 'I don't think he had' started farming in 1913, although 'I don't know for sure.' S. E. Nelson testified that J. Hansel Nelson had a 230-acre tract of land in Union Parish, Louisiana, a lot and house in Junction City, Louisiana, was not a pauper and his estate was solvent and that he, as tutor for James Word Nelson, had

received the net distributive share of James Word Nelson which after paying a fifteen per cent. attorney fee therefrom, amounted to approximately $1,000."

On November 3, 1927, Elmer Nelson was appointed administrator of the estate of J. Hansel Nelson, deceased, and guardian in succession, of James Word Nelson, by the Union probate court.

Finding no funds belonging to the guardianship of James Word Nelson, a minor, Elmer Nelson filed a petition and secured an order from the Union probate court to sell the lands in question on the ground that they had been bought by J. Hansel Nelson with funds belonging to his ward, James Word Nelson; that some $3,000 had been left to James Word Nelson from the estate of his mother, Stella Word Nelson, and that this money had been turned over to J. Hansel Nelson during his lifetime as guardian, and that J. Hansel Nelson had invested $2,000 of this fund in the lands in question, taking title in his own name; that the lands in fact belonged to James Word Nelson and prayed that they be sold for his support and maintenance. Subsequently the Union probate court on December 5, 1927, granted the prayer of the petition, and the lands, after having been appraised and advertised for sale, were sold under order of the court on December 30, 1927, to appellee, J. J. Wood, for $2,700 cash. Said sale was reported to the court and approved January 3, 1928, a deed was ordered to J. J. Wood and duly executed to him on that date. This deed undertook to convey the lands in question. Appellee took possession, has retained same up until the filing of this suit, made repairs and has paid the taxes. The proceeds from the sale of this land by Elmer Nelson to appellee Wood were used by Nelson as guardian of James Word Nelson for his education and maintenance.

The record in this case is voluminous, containing some 325 pages. While there is other testimony of probative value, we have attempted to set out that part of the testimony we think, as essential and material, in an effort not to extend unduly this opinion.

It was the contention of appellee in the trial below, and here on appeal, that the evidence was sufficient to

establish that J. Hansel Nelson, while guardian of his son, James Word Nelson, used his ward's money in purchasing the lands in question, and though he took title in his own name, he created a trust in these lands for the benefit of his ward, James Word Nelson, and that he (James Word Nelson) then became the equitable owner of the property. He insisted that a constructive trust had been established in the lands in favor of James Word Nelson, and that appellants had no interest in them, and that James Word Nelson is now estopped to assert any.

Appellants (plaintiffs below) contended in the lower court, and insist here, that the title to the land in question was vested in them by inheritance unaffected by the purported sale by the administrator, Elmer Nelson, to the defendant, and that the appellee's, J. J .Wood's, assertion of the alleged trust was neither proven in fact nor tenable in law.

From a decree of the chancellor sustaining appellee's contention comes this appeal.

The general rule, as well as the established rule in this state, seems to be well settled that in order for one to establish by parol either a resulting or constructive trust, the evidence must be ''full, clear and convincing,'' ''full, clear and conclusive,'' ''of so positive a character as to leave no doubt of the fact,'' and ''of such clearness and certainty of purpose as to leave no well founded doubt upon the subject.'' These requirements run through a long line of cases from this court.

In *Tillar* v. *Henry,* 75 Ark. 446, 88 S. W. 573, this court said:

''Constructive trusts may be proved by parol, but parol evidence is received with great caution, and the courts uniformly require the evidence to establish such trust to be clear and satisfactory. Sometimes it is expressed that the 'evidence offered for this purpose must be of so positive a character as to leave no doubt of the fact,' and sometimes it is expressed as requiring the evidence to be 'full, clear and convincing,' and sometimes expressed as requiring it to be 'clearly established.' *Crittenden* v. *Woodruff,* 11 Ark. 82; *Trapnall* v. *Brown,* 19 Ark. 39; *Johnson* v. *Richardson,* 44 Ark. 365; *Richard-*

*son* v. *Taylor*, 45 Ark. 472; *Robinson* v. *Robinson*, 45 Ark. 481; *Crow* v. *Watkins*, 48 Ark. 169, 2 S. W. 659; *Camden* v. *Bennett*, 64 Ark. 155, 41 S. W. 854; 1 Perry on Trusts, § 137.''

Tested by the above rule, is the evidence as reflected by this record sufficient to establish a constructive trust in this case? We think it is.

In the well considered case of *Shelton* v. *Lewis*, 27 Ark. 190, principally relied upon by appellee here (and also cited by appellant) in which the essential facts are quite similar to those in the instant case, we think the principles of law announced are controlling here.

The facts in that case were that Jacob A. Lewis died in Russell county, Alabama, possessed of a large estate, and left surviving him a widow, Mary B., and several children. Mary B. Lewis remarried one Bryant Duncan in Alabama, and Duncan was appointed guardian for the Lewis children by the probate court of Russell county, Alabama. Bryant Duncan made a final settlement with that probate court, shortly before removing to Arkansas in early 1859, and showed about $25,000 and some slaves in his hands, as guardian of the Lewis children. Bryant Duncan removed to Crittenden county, Arkansas, with the Lewis children early in 1859, and bought lands in November, 1858, paying only partially for same. Duncan died in 1864, and the holders of vendors' lien notes against these lands sued the administrator of Duncan's estate to foreclose such notes. The heirs of Jacob A. Lewis intervened, claiming that Duncan had used his wards' (the Lewis heirs) money in partially paying for such lands and that they were entitled to have the title divested out of the heirs of Duncan and vested in themselves.

The evidence showed that Duncan had received the Lewis heirs' money as guardian and had used a portion of such money in buying the litigated lands. The evidence also showed that Duncan was not a man of means when receiving the moneys and property of the Lewis heirs and also that Duncan had repeatedly stated in his lifetime that he had bought these lands for his wards.

In the opinion this court said:

"It is established by other testimony that at the time of the marriage between Duncan and the mother of the appellees, and when appointed guardian, he (Duncan) was a man of no property whatever and insolvent. It is equally well settled by testimony that, when Duncan removed to Arkansas, he had no property or money, save such as remained of the estate of his said wards, and that he brought to Arkansas the identical negroes that belonged to the estate of Jacob A. Lewis. From the record there can be no doubt that whatever of money was paid by Duncan on the lands was paid out of money belonging to his wards. There is much proof of statements made by Duncan in his lifetime that he bought the lands for his wards. . . . Duncan, when he purchased . . . held in trust for his wards, the appellees."

Tested by the foregoing principles of law as announced by this court, it is our view, on this record, that appellee has met the burden imposed upon him by that quantum of proof required, that the moneys of James Word Nelson were used in 1913 by his father and guardian, J. Hansel Nelson, to purchase from Muse Bros., of Junction City, Arkansas, the lands in question; that J. Hansel Nelson violated the trust relationship by taking title in his own name; and that at the time title was taken in J. Hansel Nelson's name, the equitable title to this property passed immediately to James Word Nelson and that thereafter James Word Nelson was the sole owner thereof, despite the fact that legal title was taken in the name of his father and guardian, and that appellants have no rights in these lands which may be asserted here.

It is next contended by appellants that James Word Nelson, the beneficiary of the trust so created, is the only person who can assert that trust, and that appellee, Wood, is not entitled to the benefits of the trust. We think this contention cannot be sustained.

To support this contention, appellants quote from *Shelton* v. *Lewis, supra,* as follows: "The rule is that where one holds money of another, in any fiduciary character and invests in the purchase of land, taking the conveyance himself, the person entitled to the money may, at his election, charge the trustee personally or follow

the money into the land and claim the purchase as made in trust for him, and he may establish such trust by parol evidence." We think it clear, however, that this court did not hold in that case, and had no intention of holding, that the beneficiary of such trust could alone assert the trust.

For authority directly allowing persons other than the *cestui que trust* to enforce a violated trust, in R. C. L., vol. 26, p. 1360, on the subject of Trusts, § 224, the author says: "With regard to who are necessary and proper parties to proceedings to establish and enforce trusts, parties by representation, joinder of parties, defects and objections as to parties, etc., the general rules as to parties in equity apply. . . . A resulting trust is created in notes secured by a mortgage where the purchase is made with the joint funds of two persons and title taken in the name of but one; and in such a case if the *cestui que trust* conveys an interest in the property to the plaintiff, a trust is created in his favor which attaches to the land·if the mortgage is foreclosed, and the trustee can bring a suit in his own name to enforce the trust. . . ."

And further in § 230: "In proceedings to establish and enforce trusts, as in other suits in equity, the relief granted will be moulded and adapted to the circumstances of each case . . . On assignment of a trust in a trust estate, the trustee holds the land in trust for the assignee, and a conveyance will be directly enforced from the trustee in his (the assignee's) favor, and the conveyance when made will discharge the assignor from so much of his contract as shall thereby have been performed."

See, as supporting the text, *Buck* v. *Swazey*, 35 Maine 41, 56 Am. Dec. 681.

It is our view, therefore, that J. J. Wood, appellee, is entitled in this case to assert and enforce the trust created by J. Hansel Nelson in using the funds of James Word Nelson in purchasing the lands in question.

Finally appellants contend that the sale of the land in question by the administrator, Elmer Nelson, to appellee, J. J. Wood, is void.

Conceding, without deciding, that this contention is true, since the result of our views is that the decree of the learned chancellor is correct, that James Word Nelson was the only person possessing any interest at all in the lands in question, after J. Hansel Nelson had purchased said lands with the moneys of his ward, James Word Nelson, it follows that James Word Nelson is the only person in a position to question the proceedings by which appellee acquired title to these lands, and admittedly he has long since been barred from asserting any claim to these lands, and since Elmer Nelson, James Word Nelson's guardian in succession, sold these lands to appellee, Wood, and expended all the proceeds from the sale ($2,700) for the benefit of his ward, it was clearly within the power of the chancery court to disallow appellants' claims to the litigated property and to quiet appellee's title thereto.

We conclude, therefore, after a careful review of this entire record, that no errors appear, and accordingly the judgment is affimed.