Garrett HACKWORTH and Bertha C.
HACKWORTH and Richard M. COURSON
*v.* FIRST NATIONAL BANK OF
CROSSETT, Crossett, Arkansas

78-329                                    580 S.W. 2d 465

Opinion delivered May 7, 1979
(Division II)

*Paul S. Rainwater,* for appellants.

*Arnold, Hamilton & Streetman,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellee, First National Bank of Crossett, brought this foreclosure action against appellants Garrett Hackworth and Bertha C. Hackworth, d/b/a The Hack Shop and Richard M. Courson, the uncle of Bertha Hackworth, on a real estate mortgage and a security agreement covering inventory, furniture and fixtures of The Hack Shop, a business operated by Garrett Hackworth. Appellants contended that the security interest held by appellee had been extinguished by payment of the original

notes secured by the security agreement. The chancery court sustained appellee's contentions and ordered foreclosure. We affirm.

The suit was brought on appellee's note No. 09693, dated October 6, 1976, for $12,750.00, executed by Garrett and Bertha C. Hackworth. Appellee contended that this note was a renewal of its note No. 04913, dated September 26, 1975, for $12,750.00, also executed by Garrett and Bertha C. Hackworth. A real estate mortgage was given by Harry and Betty Courson, parents of Bertha Hackworth, to secure this note. Appellee contended that both note No. 04913 and note No. 09693 were secured by both the real estate mortgage and the security interest in the inventory, furniture and fixtures of The Hack Shop, by virtue of the security agreement. On this basis, the property was attached and sold under the orders of the chancery court in this proceeding.

Appellants contend that the attachment was wrongful because the bank had no security interest at the time of the attachment. Richard M. Courson is a party because he loaned money to Garrett and Bertha Hackworth on the basis of a security agreement covering the same personalty. This security agreement was executed on July 11, 1977.

The sole point for reversal is the assertion that the finding of the chancellor was clearly against the preponderance of the evidence.

The security agreement on which the bank relied was dated September 26, 1974. A financing statement evidencing this security interest was filed in the offices of the Secretary of State of the State of Arkansas and the Circuit Court Clerk and Recorder of Ashley County. This statement showed no maturity date on the debt secured. No termination statement was ever filed. This security agreement secured an original loan of $38,439.42, evidenced by two notes, one for $13,-000.00 and the other for $25,439.42, both due one year after date. The original notes were executed by the Hackworths and by Mrs. Hackworth's parents. The bank contended that this indebtedness was not paid but was extended on September 26, 1975, by renewal notes and that the unpaid balance of the note for $13,000.00 was again extended for six

months by the renewal note dated October 6, 1976. There was a balance of $12,516.43 principal and $648.12 interest due on this note when the foreclosure suit was filed. This was the only indebtedness owed the bank by the Hackworths at that time. The decision turns substantially upon the question whether the note executed on September 26, 1975, was a renewal of one of the two promissory notes described in the security agreement with the bank.

In support of their contention that the note on which the foreclosure suit was based was not a renewal, appellants rely on the testimony of Garrett Hackworth and the fact that the original note was marked paid by the bank. This mark was placed upon the note by J. B. Posey, Vice Chairman of the Board of Directors of First National Bank of Crossett. The date of payment indicated was "9-25-75." There was no notation "Paid by Renewal" similar to that put on a later note extending the debt of the Hackworths which was evidenced by the note dated September 26, 1975, which appellee contends was a renewal or extension of one of the original notes and which appellants contend was a new loan.

Garrett Hackworth testified that the original note dated September 25, 1974, was paid to the bank on September 26, 1975, the date of the note the bank claims was a renewal or extension of the balance then due on the original note. He said that new notes were executed on September 26, 1975 and a new real estate mortgage taken to secure them. He testified that he asked Posey if the inventory was included and that Posey replied, "No, not with this type of collateral. We would not need the security of merchandise." He added that he had asked if he needed to sign another security agreement and that Posey answered that one would not be needed and that the bank had sufficient collateral in the real estate. He said that the proceeds of the notes executed on September 26, 1975, were used to pay off the original notes. He pointed out that the later notes both bore a notation "realty mortgage" and that the note later paid had a notation, "Payment of this note is secured by a realty mortgage." There was no reference to a security agreement on either note. Garrett Hackworth said that there was no discussion of collateral at the time the note on which this suit is based was signed, but that, when he paid the larger note in July of 1977, Posey stated that the

bank would be willing to go ahead and renew this note, if "the store" was put up for collateral, and showed him a new security agreement already prepared. Hackworth testified that he told Posey he could not give the bank a "first mortgage" on the store, because he had already given one to Robert Courson, but that he would be glad to give the bank a second mortgage. According to Hackworth, Posey declined this offer. Hackworth stated that when he executed the security agreement with Robert Courson and the accompanying financing statement on July 6, 1977, he did not realize that the bank claimed a security interest in the inventory, furniture and fixtures.

Posey testified that the transaction which took place on September 25 and 26, 1975, was the result of an agreement on the part of the bank to renew the balance due on the two original notes after Garrett Hackworth had reported that his father-in-law was in a "deteriorating condition" and that the notes could not be paid except in installments similar to those being made on the larger of the two notes. Posey said that the Hackworths never requested that the bank release its security interest and that there had never been any discussion about renewing or releasing security interests. He acknowledged that he made the "paid" notation on the original note, but said that it was not paid in "good funds." Posey explained the taking of a new real estate mortgage, and not a new security agreement, by stating that, because of payments made, the amounts of the notes were changed, but that a change in amount on the security agreement was unnecessary. He stated that he did not request that Hackworth execute a new security agreement at the time the larger note was paid, but said that the bank did offer to renew the debt represented by the note on which this suit is based and, when Hackworth did not pursue the matter, there was no discussion of "mechanics." Posey denied that a new security agreement had been prepared. No request was ever made for a termination statement on the bank's security interest. A secured party is required to file such a statement upon demand of the debtor when there is no outstanding secured obligation and no commitment to make advances. Ark. Stat. Ann. § 85-9-404 (Supp. 1977).

On the testimony outlined above, there was only a ques-

tion of credibility to be resolved by the chancellor. There are additional facts, however, that weigh heavily in favor of appellee, and probably assisted the chancellor to resolve the question without difficulty.

James Nolley, the owner of Guy Nolley Insurance Agency, had issued a policy of insurance on the contents of The Hack Shop on March 3, 1975. It was for a term of three years. It had a loss payable clause in favor of appellee. This policy remained in effect until November 10, 1977, without any change in the mortgage clause. The premium was billed in annual installments which were paid by Hackworth. Nolley testified that it was the practice of his agency to check on each anniversary of such a policy to determine whether the mortgagee still has a mortgage. Although Nolley considered every third year to be the anniversary of a three year policy, he said that his agency attempted to inquire about the mortgagee every year. He had no specific recollection of having asked Hackworth about this. Posey testified that at a conference with the Hackworths on May 1, 1977, they had a conversation about payment of premiums on this policy, and he was assured that they had been paid. He also stated that he made a trip to the agency to ascertain whether the premiums had been paid and the coverage was still in effect.

It is also significant that the first real estate mortgage was not released until the bank agreed to release both mortgages upon payment of the larger of the two notes executed on September 26, 1975. The undisputed evidence also shows that Hackworth periodically furnished the bank with inventories of the collateral covered by the bank's security agreement during the entire period any of the indebtedness remained outstanding. One of them was dated December 31, 1976.

Hackworth testified that he never requested a termination statement because he didn't know that a request was required. He denied having had any discussion with the Guy Nolley Insurance Agency about the mortgage clause, and said that removal of the mortgage clause never entered his mind. He admitted that inventories were furnished because the bank requested them, but said that the reason he furnished them was because he owed the bank, was buying

merchandise and making "other" notes. The actions of the parties certainly tend to corroborate the testimony of Posey.

Even though we try chancery cases de novo, we do not reverse the chancery court's decree, unless the chancellor's findings are clearly against the preponderance of the evidence. Since the question of preponderance turns largely upon the credibility of the witnesses, we defer to the superior position of the chancellor. *Massey* v. *Price,* 252 Ark. 617, 480 S.W. 2d 337; *Loftin* v. *Goza,* 244 Ark. 373, 425 S.W. 2d 291; *Guaranty Financial Corp.* v. *Harden,* 244 Ark. 846, 427 S.W. 2d 548; *Dodds* v. *Dodds,* 246 Ark. 313, 438 S.W. 2d 54; *Marine Mart, Inc.* v. *Pearce,* 252 Ark. 601, 480 S.W. 2d 133.

Most of appellants' arguments turn upon the question whether the security agreement remained in force after September 25, 1974, and we cannot say that the chancellor's finding in this regard was clearly against the preponderance of the evidence. Appellants did express their disagreement with our decision in *Associated Business Investment Corp.* v. *The First National Bank of Conway,* 264 Ark. 611, 573 S.W. 2d 328 (1978), and expressed a preference for *Safe Deposit Bank & Trust Company* v. *Berman,* 393 F. 2d 401 (1st Cir., 1968). The question there involved was whether a security agreement covered advances made after the original obligation had been paid. The question here is primarily a factual one, i.e., whether the original obligation had been paid. Even so, in the security agreement in this case, the indebtedness recited therein covered "all future advances made by secured party for taxes, insurance, repairs or otherwise advanced to debtor prior to satisfaction hereof." The indebtedness, according to the chancellor's holding, was not paid, but even if it had been, the loan on September 26, 1975, would have been a future advance made, not only prior to satisfaction of the security agreement, but, since, under the Hackworths' version, it was made to enable them to pay the notes described in the agreement, it was necessarily made before those notes were actually paid.

We find no conflict in our decision and that of the Fifth Circuit Court of Appeals. The security agreement in that case secured only certain *notes* (not *indebtedness*) and renewals and extensions thereof. The secured creditor in that case sought

to enforce a "future advance," rather than an extension or renewal of the notes described in the security agreement, against a trustee in bankruptcy, who stood in the position of a subsequent lien creditor.

The Hackworths also contend that the court erred in dismissing their counterclaim for damages for wrongful attachment because appellee, in obtaining an attachment of the property covered by the security agreement, did not comply with Ark. Stat. Ann. §§ 34-2119 — 34-2123 (Supp. 1977). This statute does not apply to attachments. It applies only to actions in which the plaintiff claims a right to possession of property in possession of another, which would usually, if not always, be a replevin suit. This attachment merely held the property attached as security for the satisfaction of a judgment which may be recovered. Ark. Stat. Ann. § 31-101 (Repl. 1962). By it, the property was taken into the custody of the sheriff to be held subject to the order of the court. Ark. Stat. Ann. §§ 31-110, -114 (Repl. 1962).

Appellants also contend that the attachment was wrongful because appellee did not allege or prove any of the essential grounds for attachment under Ark. Stat. Ann. § 31-101 et seq (Repl. 1962). We disagree. Appellee filed a verified "Complaint for Foreclosure and Order of Attachment." This pleading contained an allegation that the value of the security was diminishing and that Hackworth was in the process of selling or disposing of the collateral and that the collateral was in danger of being sold, concealed or moved from the premises in derogation of the rights and interest of appellee, without the proceeds being applied to the debt owing to appellee, and contrary to the terms of the security agreement. It was further alleged that, if the property were not attached, it would greatly diminish to the detriment of appellee. On the same day this complaint was filed, the court ordered the issuance of the attachment, but provided that appellants might obtain release of the property upon filing a corporate surety bond for $15,000, in favor of appellee. Appellee filed its attachment bond on August 3, 1977. The allegations made by appellee stated a ground for attachment under subdivision 8 of § 31-101. Ark. Stat. Ann. § 31-149 (Repl. 1962) provides a method under which a defendant may move for discharge of an attachment and have a hearing if the grounds for attach-

ment are controverted. No such motion was filed. The only controversion of the allegations of the complaint was denials in the answer filed.

No hearing on the grounds for attachment in advance of the trial was held or sought, even though the court ordered a commissioner to sell the attached property upon the petition of appellee, to which appellants filed a response. The order of sale recites that the matter came on for hearing upon appellee's petition, but a transcript of the hearing does not appear in the record.

At the trial, W. C. Norman, Jr., president of the bank, testified that during June, July and August of 1977, he was trying to work out a solution to the default status of the Hackworth loan and to negotiate a settlement with Garrett Hackworth and his attorney. According to Norman, Hackworth was conducting a sale at The Hack Shop. Norman exhibited a newspaper advertisement which he said was typical of that being conducted in a newspaper and on radio. Norman said this caused the bank concern about the dissipation of the collateral without the debt to the bank being paid, and caused the bank to apply for attachment of this collateral, which was accomplished on August 4, 1977. He said that the bank's efforts at this time to secure a commitment from Hackworth that would insure payment of the debt had been unsuccessful.

Hackworth testified that the sale advertised was promotional only, to raise funds, rather than a "going out of business sale," even though it was called a liquidation sale in the advertising done. He said that he had discussed the sale with Posey, but that, after it had gone on for ten days, it was stopped by the attachment on August 4. He said that he learned on July 28, 1977, that the bank was planning to file the suit.

Again, we are unable to say that the holding of the trial court sustaining the attachment was clearly against the preponderance of the evidence.

The decree is affirmed.

We agree. HARRIS, C.J., and HOLT and PURTLE, JJ.