John ANDRES et al *v.* Adolph ANDRES
and Marie ANDRES et al

CA 80-425                                    613 S.W. 2d 404

Court of Appeals of Arkansas
Opinion delivered March 25, 1981
[Rehearing denied April 22, 1981.]

*Eugene Hunt, Robert D. Smith, III*, and *H. Vann Smith*, for appellants.

*Acchione & King, Howard C. Yates, William L. Owen* and *Allen Gates*, for appellees.

GEORGE K. CRACRAFT, Judge. Appellants brought this action in November of 1979 against appellees. They alleged that between the years 1938 and 1942 appellee, Adolph Andres, purchased by separate deeds lands aggregrating 440 acres which were acquired by funds produced from their labor, but title to which had been placed in the name of Adolph. They contend that he had refused to convey to them their interest therein and prayed that the court declare that Adolph held title thereto as trustee for their use and benefit under resulting, constructive or implied trust. They also prayed that a deed executed by Adolph Andres and his brother, John, to the appellees, Mark Stelljes and Elizabeth Stelljes, be set aside on the grounds that at the time of its execution John Andres was mentally incompetent. At the conclusion of the appellants' evidence appellees moved to dismiss the complaint by demurring to the evidence. The court sustained that motion as to the prayer for the imposition of a trust, but denied it as to the capacity of John Andres to make the deed in question. After hearing further evidence the trial court found that John Andres did not lack the capacity to execute the deed and dismissed the complaint of the appellants for want of equity. The appellants appeal from both rulings of the court.

The evidence indicated Frank Andres immigrated to the United States from Switzerland in 1928 and settled with his wife and seven children in St. Vincents in Conway County. Subsequently, Frank Andres purchased 160 acres of land which was referred to throughout the testimony as the "home place." The title to this tract is not in issue in this case. Prior to his death in 1939 he purchased 80 acres of land but had the title taken in the name of his son, Adolph Andres, as a gift.

Shortly after the conveyance to Adolph the father died. Adolph, his mother, and brothers and sisters, John, Frank,

Marie and Fides, continued to reside on the home place. Adolph, as the only adult child, was the "head of the household." He farmed the home place and rented additional acreage on which he raised cotton. Between 1939 and 1942 he purchased by separate deeds the tracts now in issue totalling 440 acres for which he paid $1.00 per acre. One 40 acre tract was purchased by John, but taken in the name of Adolph, during Adolph's absence from the farm during the winter. Adolph was the owner of some property and rented other lands, but none of the younger brothers and sisters had any property whatsoever. During the period in which the lands were acquired the younger brothers and sisters were living on the home place with Adolph and worked in the fields, did the family chores, attended livestock and assisted in maintaining the household.

There was evidence from the younger brothers and sisters that they all worked alongside of Adolph, pooling the family income, and that it was from these funds that the lands were purchased by Adolph. They testified that when the lands were purchased "we had a family conference." One of the elder sisters who worked in Morrilton, and her brother Frank, while in military service, were said to have sent money home to their mother from time to time.

In 1961 Adolph conveyed an undivided one-half interest in the tracts to the appellant John, who testified that he was holding his interest in trust for the others but that there had never been any discussions as to the respective interests of the parties or in what manner the property was to be divided.

## RESULTING TRUST

Appellants contend that the court erred in granting the motion made at the conclusion of their evidence asserting that the court is required on such a motion to give the evidence its strongest probative value in favor of the appellants and to grant the motion to dismiss (demurrer to the evidence) only if the evidence, when so considered, fails to make a prima facie case. *Lafayette County Industrial Devel. Corp.* v. *First National Bank*, 246 Ark. 109, 436 S.W. 2d 814. Appellees argue that the "prima facie" rule does not apply

in a case seeking to impose a resulting trust where the proof is required to be "full, clear and convincing." *Nelson* v. *Wood*, 199 Ark. 1019, 137 S.W. 2d 929. We find the appellants' proof to fail whichever be the proper test.

Appellants stated in oral argument, and we agree, that what is sought to be imposed is a resulting trust. In general a resulting trust is said to arise when property is bought by one person with money or assets of another and title is taken in the name of the purchaser rather than of the person furnishing the consideration. In order to constitute a resulting trust the purchase money or a specified part of it must have been paid by another or secured by another at the same time, or previous to the purchase, and must be a part of the transaction. In other words, the trust results from the original transaction at the time it takes place and at no other time. *Bland* v. *Talley*, 50 Ark. 71, 6 S.W. 234; *Castleberry* v. *Castleberry*, 165 Ark. 505, 264 S.W. 979; *Mortensen* v. *Ballard*, 209 Ark. 1, 188 S.W. 747; *Cherokee Carpet Mills, Inc.* v. *Worthen Bank and Trust Co.*, 262 Ark. 776, 561 S.W. 2d 310.

The testimony is typical of family farm situations. Adolph was the only adult among the children of the family at that time. His brothers and sisters were still in their teens. As head of the household he farmed the home place and rented other acreages close by. These lands and their products provided all of the family maintenance and income. As in all farm families the younger brothers and sisters did their chores on the farm. There is no evidence that they were ever paid for this work or were expecting to be paid. They were fed, clothed, housed and educated from the income derived from the lands farmed or leased by Adolph. There is no evidence that he ever had in his possession any money belonging to any of them.

Although there was evidence that some of the children who did not live in the household had sent money home to help support the family, there was no evidence that they ever paid any money to Adolph or that Adolph had in his possession at any time any specified amounts of money belonging to any of them.

The case of *Castleberry* v. *Castleberry*, supra, cannot be distinguished in any material part. There the court declared:

> The law is well settled that in order to create a resulting trust, the purchase money or some part must be paid by another or secured by another previous to or at the time of the purchase. Here at the time of the alleged agreement, no money was put up or secured by any of the parties here with which to purchase any lands, except E. N. Castleberry who owned a horse of the value of $50. None of the other parties to the alleged agreement had any property whatever. We think that the most that can be said of the relationship here is that the parties agreed to live together, work, make a living, bargain for, and acquire lands, to be paid for out of their joint earnings, which we think falls far short of establishing a resulting trust.

> A resulting trust has been defined by this court in *Kerby* v. *Feild*, 183 Ark. 714, 38 S.W. 2d 308, as follows: 'In order to constitute a resulting trust, the purchase money or a specified part of it must have been paid by another or secured by another at the same time, or previously to the purchase, and must be a part of the transaction. In other words, the trust results from the original transaction at the time it takes place and at no other time, and it is founded on the actual payment of money and upon no other ground. *Red Bud Realty Co.* v. *South*, 96 Ark. 281, 131 S.W. 2d 340. ...

Appellants had the burden of proving by clear and convincing evidence not only that the funds making up the purchase price belonged to them, but also the definite amount provided by each of them, *Harbour* v. *Harbour*, 207 Ark. 551, 181 S.W. 2d 805. The evidence presented falls far short of establishing either element.

### CONSTRUCTIVE OR IMPLIED TRUST

Appellants' evidence also failed to establish a constructive or "implied trust." Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial

interest against one who secured legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his own, or who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud. *Armstrong* v. *Armstrong*, 181 Ark. 597, 27 S.W. 2d 88; *Walker* v. *Biddie*, 225 Ark. 654, 284 S.W. 2d 840; *Nelson* v. *Wood*, supra. Where actual fraud is practiced in acquiring legal title, the arising trust is referred to as a trust ex maleficio. *Barron* v. *Stuart*, 136 Ark. 481, 207 S.W. 22.

The term "implied trust" includes constructive trusts, trusts ex maleficio and resulting trusts, all of which arise by implication of law. *Ripley* v. *Kelly*, 207 Ark. 1011, 183 S.W. 2d 794; *Stacy* v. *Stacy*, 175 Ark. 763, 300 S.W. 437. Resulting trusts, trusts ex maleficio and constructive trusts are "implied trusts." Such trusts arise whenever it appears from the accompanying facts and circumstances that the beneficial interest should not go with the legal title. *Stacy* v. *Stacy*, supra; *Warren* v. *Wheatley*, 231 Ark. 707, 331 S.W. 2d 843; *Hunt* v. *Hunt*, 202 Ark. 130, 149 S.W. 2d 930.

The evidence does not show that the title was obtained by Adolph upon any false or fraudulent agreement to take title in his name for their benefit or to hold title for a specific purpose or that it was the clear intention of the parties that he do so. None of the appellants so testified. They "figured" that they might acquire an interest someday or "hoped" that they would be included in some final disposition, but there are no words implying that Adolph had ever made any express or implied promise to that effect or that the purchases had ever been discussed in terms of agreement. There was no showing that he was under any confidential or fiduciary duty to do so. Simply because the parties were related or lived in the same household does not alone establish a confidential relationship. *Jones* v. *Gachot*, 217 Ark. 462, 230 S.W. 2d 937; *Bottenfield* v. *Wood & Miller*, 264 Ark. 505, 573 S.W. 2d 307; *Castleberry* v. *Castleberry*, supra.

## LACHES

The last of these tracts was acquired by Adolph in 1942.

A period of thirty-eight years elapsed before any of the appellants claimed that the purchases were being made for their use or benefit. None of them sought to assert any right of equitable ownership until after natural gas was discovered in the area and a well drilled on the property. The chancellor held that they were barred by doctrine of laches as a result of this long delay. We agree.

In *Castleberry* the court commented on similar circumstances as follows:

> At the time of E. N. Castleberry's death in 1916, his son Arthur Castleberry (one of the appellants), was two years of age. Arthur and his mother continued to live on the property for a few years then rented it out, sold timber from some of the land, and operated it without any complaint from these appellees until shortly after 1935 when this litigation was commenced. Thus appellees waited nearly twenty years following E. N. Castleberry's death to assert claims to this property. We think they are too late.

### VALIDITY OF JOHN ANDRES'S DEED

In 1974 Adolph made tentative arrangements with the appellee, Stelljes, to move onto the property at a location where they could be helpful in looking after John, who had become lonesome after the death of his mother. It was testified that after discussing that matter with John, Adolph and his wife joined with John in a deed dated April 9, 1974, in which they conveyed 40 acres of the property to Mark and Elizabeth Ann Stelljes, who thereafter resided in a trailer on the property.

Appellants offered testimony tending to prove that John Andres was mentally incompetent to execute a deed on that date and sought to have the deed in question set aside. Dr. Robert D. Brooks, a psychiatrist in St. Louis, examined Andres in August 1974, and found that John suffered from a psychotic condition at that time. It was his further finding that John was incapable of making valid judgments, and concluded that the history given by John "strongly sug-

gested" that he could have been ill to some extent for at least the preceding six months. There was testimony from other witnesses tending to show incompetency.

There was, however, testimony that the deed to Stelljes was thoroughly discussed by John, Adolph and Stelljes, and that in these discussions John had placed some stipulations on the transaction which were subsequently met. There was testimony that on the date on which the deed was signed and for some time before and after that date, John was perfectly normal and was capable of executing a valid deed. There was testimony not only as to his mental condition at the time, but that John had spent a full day after the execution of the deed helping the Stelljeses move their trailer onto the property. During that entire period they noticed nothing abnormal about his activities. There was evidence from one of the appellants that John had informed her about the execution of the deed within a month after it was delivered.

The fact that John may have lacked the capacity to execute a deed in August or that his incapacity may have existed at some earlier date is not controlling. The determination of whether a deed is void because of the mental capacity of a grantor is measured by his mental ability *at the time* of the execution of the deed. If he is possessed of the requisite capacity *at that time*, the deed is valid. *Donaldson* v. *Johnson*, 235 Ark. 348, 359 S.W. 2d 810. The burden is upon the attacking party to establish mental capacity, *Culling* v. *Webb*, 208 Ark. 631, 187 S.W. 2d 173.

The testimony of the psychiatrist is not conclusive. It must be considered along with all other evidence bearing on the issue. There was sufficient evidence to warrant the finding that John did have the required mental capacity and awareness on the date this deed was executed.

The findings of the chancellor will not be reversed unless clearly against a preponderance of the evidence. Since the question of a preponderance of the evidence turns largely on the credibility of the witnesses, we defer to the superior position of the chancellor. *Hackworth* v. *First National Bank of Crossett*, 265 Ark. 668, 580 S.W. 2d 465.

We affirm.