Emmett COYNE *v.* Jeanne M. COYNE and
Katherine CAREY

CA 82-368                                654 S.W.2d 584

Court of Appeals of Arkansas
Opinion delivered June 29, 1983
[Rehearing denied August 24, 1983.]

*Dewey Moore,* for appellant.

*Steve M. Lowry* and *House, Holmes & Jewell, P.A.,* by: *Philip E. Dixon,* for appellees.

Tom Glaze, Judge. This case involves a dispute over the ownership of stock in Master Hair Care, Inc. (MHC), which operates four Fantastic Sam's franchises in Little Rock, North Little Rock and Jacksonville, Arkansas. Appellant, Emmett Coyne, contends he owns 50% of the stock, but appellees, Jeanne Coyne (Emmett's sister) and Katherine Carey, argue they own all of MHC's stock. Emmett originated this action by filing suit, alleging his (1) entitlement to 50% of MHC's stock, and (2) right to access of the corporation's books and financial records. He further requested a temporary injunction to restrain appellees from taking any action which would affect the parties' respective positions or deplete corporate assets. Appellees answered

and counterclaimed, denying appellant owned any MHC stock, raising several defenses and seeking both general and punitive damages for alleged wrongful acts performed by appellant. Appellant's request for a temporary injunction was granted pending this action. The trial court appointed a special master to hear this cause, and after listening to extensive testimony, the master filed a twenty-two page report, finding in appellees' favor, except he found appellant should receive $10,000 for certain services rendered on MHC's behalf. Later, as a part of his decision, the chancellor adopted the master's findings but rejected that part awarding $10,000 damages to appellant. Appellees were awarded nothing on their counterclaim.

On appeal, appellant challenges several findings made by the chancellor. However, the primary issues raised emanate from countervailing contentions made by appellant and appellees regarding what agreement, if any, the parties reached when they decided to buy the MHC stock. First, appellant argues that on March 30, 1979, he and appellees orally agreed to purchase all of MHC's outstanding stock, and that in return for his negotiating this business deal, appellant would receive one-half of the stock. He claims that he was to manage the four Fantastic Sam's shops in Pulaski County while Jeanne resided in Saudi Arabia and Katherine lived and operated a Fantastic Sam's shop in Athens, Georgia. Other witnesses testified that during the time appellant negotiated the purchase of MHC, *he told them* he would own 50% of the business. In sum, the only testimony showing that an agreement existed entitling him to 50% of the stock was attributable either directly or indirectly to assertions to that effect made by the appellant. On the other hand, appellees both denied that appellant was to receive a 50% share of the business. They related that appellant "volunteered" to do the "running around" necessary to consummate the transaction, but he was to engage an attorney to consummate the contract. Jeanne gave her power of attorney to appellant, and he kept her informed on the developments; however, most of his contacts were with Katherine and Mr. Richard Rossie, the lawyer hired to represent appellees. Rossie testified that appellant was vague about any prospective ownership claim

he might have in the business. In fact, Rossie understood appellant's role was to act and to negotiate on appellees' behalf. However, Rossie minimized appellant's part in reaching the final terms agreed to by the parties. For example, appellant claimed he negotiated a reduction in the original sales price demanded by MHC's owner, Mr. Pietrangelo, but Rossie indicated Pietrangelo reduced his original demand when he decided to sell only MHC's stock, excluding its assets.

Sam Ross, the major stockholder in SMR Enterprises (the nationwide franchisor for Fantastic Sam's), also testified on behalf of appellees. Having previously known and employed appellant at SMR, Ross expressed little confidence in appellant's business acumen. Based on his experience with appellant, Ross said that he (SMR) would not have approved of the sale of MHC to appellees if he had known appellant was to be an owner; accordingly, he gained assurances from all the parties that appellant would not be involved. Ross further testified that he was told by appellant that he was not an owner.

Appellant's claim of an agreed, one-half ownership of stock is also contradicted by appellees' assertion that appellant agreed to pay $5,000 for only 8% of the outstanding shares — a claim appellant denies. All parties concede that on October 3, 1979, appellant, Katherine and Rossie met and discussed the monies needed to operate MHC and to purchase its stock. What happened or what was said at that meeting is almost entirely in dispute. Rossie and Katherine testified that $65,000 was the down payment on the $225,000 sales price for MHC; the $160,000 balance was to be paid in forty-eight monthly payments at a rate of 11% per annum. Rossie said that he questioned what amount each party would contribute towards the $65,000 down payment. His recollection was that appellant would "put in" $5,000, Jeanne $37,500 and Katherine $22,500. Rossie then determined each party's stock ownership accordingly, using $65,000 as the denominator and his or her invested amount as the numerator — Jeanne was to receive 57%, Katherine, 35%, and appellant, 8%. Appellant concedes that he never paid the $5,000, but he also argues that he never agreed to

pay it. Appellant did sign the $160,000 note twice, once for himself and once as attorney in fact for Jeanne. Katherine signed obligating herself. Nevertheless, it is undisputed that Jeanne and Katherine advanced monies totaling the full amount of the down payment, and appellant invested nothing.[1]

From the foregoing evidence, the special master found that appellees never agreed that appellant would receive 50% of the stock for his efforts in assisting appellees to consummate this sale transaction. The master further concluded that on October 3, 1979, appellant did agree to purchase 8% of the MHC stock, but because he never paid the $5,000, the stock purchase failed for want of consideration. *See* Ark. Stat. Ann. § 64-205 (Repl. 1980). The findings of a master, to the extent the court adopts them, are considered the findings of the court. Rule 52 (a) of the Arkansas Rules of Civil Procedure. It is also settled law that such findings will not be reversed unless clearly against the preponderance of the evidence. *Andres* v. *Andres,* 1 Ark. App. 75, 613 S.W.2d 404 (1981). Here, the parties presented hopelessly conflicting testimony. The master was in a position to view the witnesses, determine their credibility and weigh their testimony. In determining the stock ownership issue, the master decided against the appellant and the chancellor deferred to the superior position of the master in adopting his findings on this point. We cannot say the chancellor was clearly wrong in doing so. *See Andres* v. *Andres, supra.*

Appellant raises other issues in this appeal, but we find none has merit. Appellant argued that appellees' stock purchase was void because the subscription agreement was not in writing, was vague and lacked consideration and mutuality of obligation. This argument was largely bottomed upon Ark. Stat. Ann. § 64-203 (Repl. 1980), which provides that no pre-incorporation subscription is valid unless it is in writing, signed and delivered by the subscriber-purchaser. Section 64-203 simply is not applicable when, as

---

[1]The installment payments on the $160,000 note were paid from corporate funds; therefore, the appellees were the only ones who invested personal funds in this business venture.

here, there is an outright purchase of an ongoing corporation's existing stock. Concerning appellant's other assertions, we believe the evidence was clearly sufficient to establish the validity of appellees' purchase of stock and to support the chancellor's finding to this effect.

Finally, appellant urges the chancellor erred in finding that the temporary injunction was not meritoriously obtained and in refusing to accept the master's findings that appellant was entitled to $10,000. He also alleges error in the finding that he had no standing to assert certain matters relative to MHC's or its directors' unlawful corporate practices and that he must pay the costs of the litigation. We believe the chancellor ruled correctly.

Of course, the court must accept the master's findings of fact unless clearly erroneous. Rule 53 (e) (2) of the Arkansas Rules of Civil Procedure. However, the chancellor in the instant case did not actually disagree with the master's finding that appellant was entitled to some compensation for the services he rendered in negotiating or handling matters relative to the MHC transaction. Rather, the chancellor in effect found that appellant had received remuneration for his services because he was maintained on MHC's payroll from the time the court entered its temporary injunction on January 2, 1981, until the injunction was dissolved on March 12, 1982. During this period, appellant was paid over $20,000. Thus, the court denied the master's recommendation to pay $10,000 for the services appellant rendered. We note that appellant had filed no bond to cover damages sustained by appellees as is required by Rule 65 of the Arkansas Rules of Civil Procedure. Rule 65 (a) (2) provides no such preliminary injunction or restraining order shall be effective until the party obtaining the injunction files his bonds with the clerk, together with good and sufficient securities to be approved by the clerk, upon condition that the party giving the bond pay to the party enjoined such damages as he may sustain if it is finally decided that the injunction ought not to have been granted. Here, both parties recognized and followed the court's temporary injunction even though no bond was filed. In relevant part, the court's injunction restrained the parties

from taking any action affecting their respective salaries. Accordingly, the appellant continued to receive $400 per week until the court dissolved its temporary injunction. Although appellant contended otherwise, the court found that he was not a MHC stockholder, and in so finding, the chancellor decided no injunction should have been granted. As noted previously, we agree with the chancellor's findings and decision.

Based upon the findings adopted and made by the chancellor, we must conclude that he was correct in deciding that appellant had no standing to challenge the corporate practices conducted by appellees. Nor do we think the chancellor erred in rejecting the master's findings relative to the $10,000 award and in holding him liable for the costs of this litigation. Therefore, we affirm the trial court's decree in all respects.

Affirmed.