Jackie BETTS *v.* W.T. BETTS, Edward Betts, Billy C. Betts,
Imogene Kellogg, and Louise Simmons

96-529                                      932 S.W.2d 336

Supreme Court of Arkansas
Opinion delivered November 11, 1996

*J. E. Sanders*, for appellant.

*D. Scott Hickam*, for appellees.

ROBERT H. DUDLEY, Justice. R.C. Betts and Elsie Betts, who were in their eighties, had twelve children and owned 160 acres in Montgomery County. Six of their children thought their father was uncaring about their mother and, at times, was even menacing toward her. These six children thought that their father's mental stability had deteriorated with advanced age, and, in August 1989, one of the six, Cecil Betts, filed a petition seeking the involuntary commitment of R.C. Jackie Betts, one of the six who took the father's side, drove R.C. to the law offices of Bill Mitchell, and, there, R.C. employed Mitchell to contest the commitment peti-

tion. Mitchell successfully represented R.C., and the petition was dismissed. On the same day the petition was dismissed, August 8, 1989, Elsie Betts died. This left R.C. as the sole owner of the 160 acres. On August 10, 1989, the following letter to the editor appeared in the Glenwood *Herald News*:

> Editor: We would like for all the people who think Robert Betts is such a fine person, to call him up and congratulate him. He has refused his wife of 63 years, Elsie Betts, the right to die in peace by withdrawing all the money out of the bank and refusing to pay her doctor and hospital bills. Signed, Her children.

Shortly after the letter appeared in the local paper, on September 11, 1989, R.C. returned to Bill Mitchell's law office and had a warranty deed prepared that conveyed the 160 acres to himself and one of his sons, Jackie Betts, as joint tenants with the right of survivorship. R.C. Betts died on May 10, 1990. Mitchell, the lawyer who drafted the deed, died on the same day.

Five of Jackie Betts's brothers and sisters filed this action against Jackie: the five plaintiffs and one defendant, Jackie, are the six who took the father's side in the family dispute. The plaintiffs alleged that the purpose of the deed to Jackie was to avoid probate and that Jackie was supposed to convey title to himself and the five brothers and sisters after R.C.'s death. The five brothers and sisters alleged that Jackie refused to convey title and asked that a constructive trust be imposed on the 160 acres. The chancellor imposed a constructive trust. Jackie appeals the ruling. We affirm.

In one of Jackie's points for reversal, he argues, "The establishment of a constructive trust as to one of two joint tenants eliminates the unities of title, interest, and possession in that the establishment of the trust or the constructive trust from the date of delivery of the deed prohibits the constructive trustee from enjoying the use and benefit of the estate so granted and thereby abolishes by its very nature the benefits of the estate to be acquired." We do not reach the argument. The abstract does not reflect that the argument, or any similar argument, was made in the trial court. A nonjurisdictional argument cannot be raised for the first time on appeal. *Prudential Ins. Co.* v. *Frazier*, 323 Ark. 311, 914 S.W.2d 296 (1996); *Arkansas Dep't of Human Servs.* v. *Estate of Hogan*, 314 Ark. 19, 858 S.W.2d 105 (1993).

■■  In his other point for reversal, Jackie argues that the trial court erred in imposing a constructive trust on the property because the five brothers and sisters did not meet the appropriate burden of proof. A constructive trust is a remedial rather than a substantive institution. *Brasel v. Brasel*, 313 Ark. 337, 339, 854 S.W.2d 346, 347 (1993). In the case of constructive trusts, an obligation is imposed in order to prevent unjust enrichment. *Id.* "Such trusts arise whenever it appears from the accompanying facts and circumstances that the beneficial interest should not go with the legal title." *Andres v. Andres*, 1 Ark. App. 75, 81, 613 S.W.2d 404, 407-08 (1981). In *Edwards v. Edwards*, 311 Ark. 339, 843 S.W.2d 846 (1992), we wrote:

> The term "implied trust" encompasses both constructive trusts and various types of resulting trusts. *See* 76 Am. Jur. 2d Trusts §§ 159-163 (1992); W. Fratcher, V *Scott on Trusts* §§ 404 through 404.2 (1989) (describing the three types of resulting trusts) and § 462 (describing constructive trusts). *Hickman v. The Trust of Heath, House & Boyles*, 310 Ark. 333, 835 S.W.2d 880 (1992); *Andres v. Andres*, 1 Ark. App. 75, 613 S.W.2d 404 (1981). A constructive trust arises in favor of persons entitled to a beneficial interest against one who secured legal title either by an intentional false oral promise to hold the title for a specified purpose, or by violation of a confidential or fiduciary duty, or is guilty of any other unconscionable conduct which amounts to a constructive fraud. *Andres v. Andres, supra.*

*Id.* at 343, 843 S.W.2d at 848.

We further stated:

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, breach of a fiduciary duty, or wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment that would result if the person having the property were permitted to retain it. Ordinarily a constructive trust arises without regard to the intention of the person who transferred the property.

*Id.* at 343–44, 843 S.W.2d at 849 (quoting William F. Fratcher, V *Scott on Trusts* § 404.2 (1989)).

■■ In *Nichols* v. *Wray*, 325 Ark. 326, 925 S.W.2d 785 (1996), we set out the burden of proof in the trial court and the standard of review on appeal as follows:

> To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts, *Tillar* v. *Henry*, 75 Ark. 446, 88 S.W.573 (1905), and the burden is especially great when a title to real estate is sought to be overturned by parol evidence. *Nelson* v. *Wood*, 199 Ark. 1019, 137 S.W.2d 929 (1940). The test on review is not whether the court is convinced that there is clear and convincing evidence to support the chancellor's finding but whether it can say the chancellor's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, and we defer to the superior position of the chancellor to evaluate the evidence. *Brasel* v. *Brasel*, 313 Ark. 337, 854 S.W.2d 346 (1993); *Wright* v. *Wright*, 279 Ark. 35, 648 S.W.2d 473 (1983). *See also Davis* v. *Davis*, 48 Ark. App. 95, 890 S.W.2d 280 (1995). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *RAD-Razorback Ltd. Partnership* v. *B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986).

*Id.* at 333, 925 S.W.2d at 789.

In support of his argument on this point, Jackie cites testimony that was contrary to the finding of the trial court. However, the fact that there was testimony contrary to the trial court's finding, without more, is not sufficient for us to reverse the finding. The test is whether the trial court's finding was clearly erroneous, and a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Nichols*, 325 Ark. at 333, 925 S.W.2d at 789.

Here, the chancellor's finding that R.C. Betts intended the 160 acres to be shared by the six children who were loyal to him and that Jackie breached a duty or broke a promise to do so is supported by the testimony that six of the children were in good

standing with R.C. and six were not and by the file of Bill Mitchell, the attorney who prepared the deed, but died on the same day as did R.C. The file contained an intake sheet dated August 8, 1989, that stated that it involved a guardianship. Under the heading of "remarks" were the names of all twelve children. The top six names on the list were the six children that were not in good standing with their father. On the right side of those names, the word "no" was written. The seventh name, Walter T. Betts, was underlined. The other five, who were also in good favor, were listed under Walter's name. A separate sheet stated at the top, "160 acres— Montgomery," and listed the twelve children. The six children who were in good standing with their father had checks by their names. The names with the checks were Jackie's and the five appellees. Bruce Garnett, an attorney who shared offices with Mitchell, testified that he thought the line under Walter T. Betts's name on the intake sheet indicated those who were to benefit and those who were not to benefit. Garnett testified that he had no specific knowledge concerning the checks by the individuals' names on the other sheet. According to Garnett, Mitchell would have understood the potential for acrimony and litigation if he were to draw up a deed for a joint tenancy in which the survivor was supposed to hold the property in trust and this condition was not recited in the deed. Garnett testified that there was no routine way to handle trusts and that it was not uncommon for rural clients to be apprehensive about complex documents. He testified that it would not be uncommon for Mitchell to caution a client about the potential for acrimony, but to then go ahead and draft the deed as the client wanted. The warranty deed to R.C. and Jackie in joint tenancy with right of survivorship was in the file, as was a copy of the bitter letter to the editor.

Further testimony supporting the chancellor's findings was appellee Imogene Kellogg's testimony that she was present when Jackie promised again and again that he would divide the property six ways if R.C. would put his name on the deed; appellee Edward Betts's testimony that his father told him that he wanted the six children who were in his good graces to have the land; and appellee Louise Simmons's testimony that R.C. told her that he was putting Jackie's name on the deed because he knew that he would do what is right and divide the land among the six children in good standing.

On the other side, evidence that specifically went against the chancellor's finding, included appellant Jackie Betts's testimony that his father did not want the land divided and that his father left the land to him without imposing any conditions; appellant's testimony that his father was bothered by appellee Louise Simmons's statements that she was not interested in owning property in Arkansas and that she would sell it if any were left to her; appellant's testimony that R.C. did not trust Edward Betts; appellant's testimony that R.C. thought appellee Imogene Kellogg was wonderful when she took care of him, but he later thought she was talking about him and disclosing their conversations behind his back; testimony by appellant about the close relationship he and his father had; and the absence of a clear notation in the attorney's file about a trust.

There was other evidence that R.C. intended for the land to be divided three ways. This testimony included the testimony that appellee Imogene Kellogg, appellee Edward Betts, and appellant were the main caretakers of their father; testimony by appellee Imogene Kellogg that appellant told her that their father had changed his mind and that the land was to be divided between appellant, appellee Imogene Kellogg, and appellee Edward Betts; and testimony by appellee Edward Betts that he reminded his father that he had said that he and Imogene Kellogg were to get a share for having helped take care of him and that his father said he did not cut them out and would take care of it after he got out of the hospital.

In sum, there was a conflict in the evidence. The basic conflict came down to whether appellant Jackie Betts or appellees Imogene Kellogg, Edward Betts, and Louise Simmons were to be believed and the significance to be given the attorney's file. The chancellor saw and heard the witnesses. He saw how they responded to both direct and cross-examination and was in the superior position to evaluate their credibility. We cannot say that we are "left with the definite and firm conviction that a mistake has been committed." See *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). Accordingly, we affirm.

Affirmed.