Cite as 2023 Ark. App. 250

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-21-515

| | |
|---|---|
| MIKE GRIGSBY AND FREIDA GRIGSBY | Opinion Delivered MAY 3, 2023 |
| APPELLANTS | APPEAL FROM THE NEWTON COUNTY CIRCUIT COURT [NO. 51CV-17-11] |
| V. | |
| LOUISE L. KELLY, CHARLES L. FORD, SHARON K. BARBER, JAY BARBER, BARBARA WOODRUFF, AND DONNA MURPHY | HONORABLE GORDON WEBB, JUDGE |
| APPELLEES | AFFIRMED |

## ROBERT J. GLADWIN, Judge

Appellants Mike Grigsby and Freida Grigsby bring this one-brief appeal from a constructive trust imposed by the Newton County Circuit Court on real property, and in granting a counterclaim; and denying their petition to partition real property in its order entered on December 30, 2020. We affirm.

### I. *Facts and Procedural History*

The subject matter of this appeal involves the ownership of three approximately forty-acre parcels of land in Newton County, Arkansas (collectively the "Land"). The Land is located in the "Southeast one quarter of the Southwest one quarter of Section 34, T13N, R19W; the Southwest quarter of the Southeast quarter of Section 34, T13N, R19W; and Southeast quarter of the Southeast quarter of Section 34, T13N, R19W." As these

descriptions indicate, the Land comprises three contiguous 40-acre tracts of property on the southern part of Section 34 of Township 13 North, Range 19 West.

For the purpose of this appeal, the three 40-acre parcels have been identified as Tract 1, and Tract 2. Tract 1 is the Estalee and Leon Ford home site located in the middle of the three 40-acre tracts (SW 1/4 of the SE 1/4). Tract 2 comprises the other two parcels: "the 31.99 acres in the SE 1/4 of the SW 1/4 of Section 34 and the 40 acres in the SE 1/4 of the SE 1/4 of Section 34." Note that there is an additionally included approximately 3-acre parcel of land in the "NW 1/4 of the SE 1/4 of Section 34, T13N, R19W" (also referred to as "Tract 3"), which is in the name of Joe Ford. Joe Ford is the father of Leon Ford, who is the only child and heir of Joe Ford. All parties to this lawsuit want the court to make disposition of Tract 3 along with the land in dispute in this lawsuit, Tracts 1 and 2.

Estalee and Leon Ford built a house on the middle 40-acre parcel, Tract 1, with access from Highway 16, which runs through all the Land, east to west, more or less. On the westernmost part of Tract 2, Leon had a hog-farm business that he sold along with between 8 and 9 acres of Tract 2, leaving the Fords with 31.99 acres in Tract 2.

The Fords had six children: (1) Freida Grigsby, married to Mike Grigsby; (2) Patsy Louise Kelly, married to Dennis Eugene Kelly (deceased); (3) Charles Ford; (4) Sharon Barber, married to Jay Barber; (5) Barbara Woodruff; and (6) Donna Murphy. All are parties in this lawsuit. Leon Ford died in November 1995. Estalee Ford died in October 2006.

Leon arranged to have their home built on Tract 1 sometime before 1990. Their son-in-law and Freida's husband, Mike, helped build the house in 1977 or 1978. His

contribution was significant enough that Leon promised him land on which he could build and own a cabin, which was confirmed by virtually all of the witnesses. In 1994, Mike built a cabin on 2 1/2 acres in the part of Tract 2 that is in the 31-acre parcel west of Tract 1.

In the early 1990s, Leon experienced financial difficulties with his business, which he sold along with eight plus acres, and sought protection from bankruptcy court. The bankruptcy was dismissed the following year without discharge. The Fords had a Farm Credit lien on the Land, but we do not know precisely what property was encumbered.

By 1993, Leon had become concerned about his health, his ability to protect his home for the benefit of his wife, and his ability to protect their property from debt if he died or had to move into a nursing home. He consulted with his son, Charles, about which of his sons-in-law could be trusted with the task of moving his property out of his name. Charles recommended titling the Land with Mike because Mike could be trusted.

Other siblings also remembered hearing Leon talk about putting the Land in Mike's name with the idea that he would split it between the siblings after both he and Estalee died. Barbara testified that she was present when Leon spoke with Mike about this agreement. She recalled that Mike had agreed to this, saying, "I will, Leon."

Two other sisters testified that they knew from conversations with Leon that he believed that Mike had promised to hold the Land until the death of both of the Fords and then to split it among all the siblings. Donna said Leon told her this many times, and she was able to specify the time frame of this type of conversation around when the mortgage on Tract 1 was signed in 1995 just months before Leon died. Patsy, who, along with the Grigsbys

3

and her husband, refinanced Tract 1 and had it put in their names, stated that she likewise understood from Leon that the Land was to be divided between all the siblings after the Fords' deaths.

Even Freida testified that she understood the portion of the Land that the Fords deeded to Mike and her eventually was to be split between all the siblings. Mike also testified that he understood that in 1995, when Leon deeded Tract 1 to Freida and him along with Dennis and Patsy, it was for the purpose of refinancing the debt against Tract 1 in order to protect it so that it could be distributed to all the siblings after the deaths of both Fords. Mike did claim that he thought the deed to him of Tract 2 was a gift. In his testimony, he denied that he agreed to split the Land given to him by the Fords with the rest of the Fords' children, but in a handwritten statement produced during discovery, Mike repeatedly acknowledged that was what Leon wanted him to do with the Land—without specification as to which parcels of the Land.

In 1993, Leon executed a warranty deed for the land in Tract 2 in favor of the Grigsbys. He—or someone—held the deed until 1996, when the deed was finally recorded. In June 1995, before Leon died in November, he also deeded Tract 1 to the Grigsbys and the Kellys. They then refinanced it, put a mortgage on Tract 1, and paid off the existing Farm Credit loan. Until she died in 2006, Estalee paid the taxes and mortgage payments. After that, Patsy made the mortgage payments, and eventually paid the mortgage off, in the sum of $42,891.61. The Grigsbys paid the taxes from 2007 through 2017 in the amount of

4

$6,129.98. They also paid taxes on the two parcels of Tract 2 in the amount of $650.75 and $1,620.12 (total $2,270.87).

Mike's excuse for not having carried out Leon's wish that the Land be divided between the six siblings was that not all the "bills were paid." The primary unpaid "bill" at issue appears to be for Leon's funeral expenses dating back to 1995. In written notes he provided on April 10, 2017, as part of a discovery statement and during his testimony, Mike indicated his anger toward two siblings who have still not paid all of their respective shares of the funeral expenses and one other sister who took a long time to pay. However, there is nothing in the record before us to indicate that Mike's intention was to never split the Land between the siblings.

On March 13, 2017, the Grigsbys filed a complaint for partition against Patsy, the now single co-tenant of Tract 1. In the original complaint, the Grigsbys sought a sale by partition of Tract 1 with reimbursement to Patsy for payments she had made toward refinancing the mortgage they had taken out on Tract 1.

In the March 31 response and counterclaim, Patsy, joined by the other siblings and her spouse, expanded this case to include the rest of the Land. The counterclaim argued entitlement to the Land, which they made claim as heirs. The counterclaim sought (1) deed reformation and division; (2) entitlement to a constructive trust against Mike due to the "agreement and understanding" that the Land would be divided; (3) alternative relief for a monetary judgment as to Tract 1 as reimbursement for money Patsy paid on the mortgage and partition of Tract 1 against the Grigsbys and in favor of Patsy; or (4) alternative relief in

5

the form of division but, if not divisible, that the Land be sold. The counterclaim concerned an alleged agreement during which time Mike had title and made improvements to property, having built a home on Tract 1 for the original grantors (the Fords) and a cabin for Freida and himself on Tract 2.

The Grigsbys filed a motion to dismiss, an answer to the counterclaim, and a cross-petition to quiet title on April 24, raising the defenses of statute of limitations or, alternatively, laches, noting the conveyances at issue occurred in 1993 and 1995—the counterclaim action was brought twenty-five years after the first deed and twenty-two years after the second—and asserting that claims for contribution should have been brought within three years. On September 11, a hearing was held on the Grigsbys' motion to dismiss. On June 18, 2018, the circuit court entered an order denying the motion to dismiss because it reasoned that factual issues existed that required a trial.

The trial was held on May 9, 2019. On November 7, the circuit court issued a letter ruling that included the following findings:

> This Court, after considering all of the testimony and exhibits, finds that the clear and convincing evidence shows that there was an "agreement" between Leon Ford and Mike Grigsby that the land in Tract 1 and Tract 2 would be deeded to Mike and Fr[ei]da Grigsby to get it out of Mr. and Mrs. Ford's name due to concerns over debt the Fords owed. And, Mr. Grigsby knew, or understood, he was holding the property for all six children of the Fords.

> Due to [the] confidential trust relationship between Mr. Ford and Mr. Grigsby, his son-in-law, the Court will impose a constructive trust. All the land of Tract 1 and all of the land in Tract 2, except a 2 1/2 acres area around the Grigsbys' cabin, shall be placed in the constructive trust.

> Mr. Grigsby, as owner of the 2 1/2 acres south of Highway 16 is ordered to be surveyed and to situate the boundary of his parcel upon which the cabin is located.

He is also entitled to a designated 25′ easement of land in Tract 2 to give access to his parcel by the most direct route from Highway 16. If the Grigsbys already have an access road, from Highway 16, that will be the designated easement, if it is not on the 2 1/2 acres.

Mr. Grigsby is to deed all of Tract 1 and Tract 2, not including the land and the easement, designated above, to the children of Leon and Estalee Ford as tenants in common. The Tract 2 portion of the deed will need to have its description amended to exclude the 2 1/2 acre parcel and cabin of the Grigsbys and should reflect the access easement to the cabin.

Identified in the pleadings and the testimony is an additional and separate parcel of land, Tract 3. This land, consisting of less than 3 acres, more or less, is located in the NW 1/4 of the SE 1/4 of Section 34, T13N, Ra[n]ge 19W and is adjacent to and north of Tract 1. According to the pleadings and testimony, this land is titled in the name of Leon Ford's father, Joe Ford. Leon Ford was an only child and his father's only heir, making Mr. Ford's six children the heirs to this small parcel. The Court feels it should be included in the disposition of the other land and directs counsel to work together to see that that occurs.

The original plaintiff[s] sought partition of Tract 1. The [d]efendant[s] through their counterclaim sought partition of both Tract 2 and 3 in addition to Tract 1. Because the testimony showed that there is no way to divide this land fairly and equally among the six children, the Court believes a partition sale is necessary. The Court so orders.

The proceeds of the sale, after the costs of the sale are paid in full, are to be distributed as follows:

Ms. Patsy Kelly is to be reimbursed $42,891.61 for her expenditures in paying off the mortgage on Tract 1:

Mike and Fr[ei]da Grigsby are to be reimbursed $8,400.75 for their payment of real estate taxes on Tract 1 and 2;

Both counsel for the plaintiff and for the defendants are to be paid a reasonable attorney's fee for their efforts in partitioning and selling the property;

The rest of the proceeds are to be divided into six equal shares and distributed to each of the children of Leon and Estalee Ford.

On March 5, 2020, the Grigsbys moved to reopen the record for supplementation of evidence related to the survey of the Tract 2 property surrounding Mike's cabin as previously ordered by the circuit court. The siblings filed a response on March 9, agreeing with the Grigsbys' motion. The circuit court filed a supplemental letter ruling on December 22 addressing that motion, denying the Grigsbys' request for additional land for the cabin site, and ordering a survey.

On December 30, the circuit court entered an order expressing the above-referenced findings, denying the Grigsbys' petition to partition the Land, and granting the siblings' counterclaim. The Grigsbys filed a timely notice of appeal on August 2, 2021, following the filing of a survey in the final supplemental order entered on July 16.

II. *Standard of Review and Applicable Law*

In this appeal, the circuit court denied a petition for land partition and instead granted a counterclaim sounding in a constructive trust. The Arkansas Supreme Court stated in *Betts v. Betts*, 326 Ark. 544, 548, 932 S.W.2d 336, 338 (1996):

> To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts, and the burden is especially great when a title to real estate is sought to be overturned by parol evidence. The test on review is not whether the court is convinced that there is clear and convincing evidence to support the chancellor's finding but whether it can say the chancellor's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, and we defer to the superior position of the chancellor to evaluate the evidence. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

(Internal citations omitted.)

## III. *Discussion*

The Grigsbys' trial counsel asked the circuit court to partition and sell Tracts 1 and 3, to quiet title in Tract 2, and to dismiss the siblings' counterclaim. Instead, the circuit court granted that counterclaim and found there was a constructive trust. The Grigsbys argue that the evidence does support that there was a constructive trust. Moreover, they argue that even if there was evidence to support the circuit court's finding of a constructive trust, the siblings' counterclaim is barred by waiver, estoppel, and laches.

### A. Statute of Limitations Related to the Counterclaim

The Grigsbys focus a great deal on the length of time between the conveyances in dispute and the date of filing of the counterclaim. In this case, the conveyances in issue were in 1993 and 1995, so the counterclaim was brought twenty-five years after the first deed and twenty-two years after the second, and the Grigsbys argue that any claims for contribution should have been brought within three years. They note that Patsy relied on an agreement that she acknowledged was made sometime between November 1995 and June 2015. The Grigsbys argue that the statute-of-limitations and laches issues were critical in this case, maintaining that the circuit court erred in its ruling because of the siblings' inexcusable delay in bringing their counterclaim. They submit that it is settled in Arkansas jurisprudence that waiver, estoppel, and laches each may constitute a complete bar and that such exists in the present case. *See* Ark. R. Civ. P. 8(c) (2021).

The Grigsbys submit that this was a straightforward petition for partition in which they asked the circuit court to divide Tract 1 and reimburse Patsy for any mortgage payments

9

she made with respect to it. They note that the counterclaim likewise requested that same relief because Patsy sought reimbursement. The Grigsbys assert that the record clearly indicates that their partition action should have been allowed and that the circuit court erred in finding there was a constructive trust because it is apparent the parties could not even agree on the dates or the terms of the agreement allegedly entered into between Mike and Leon.

We note that the Grigsbys focus the majority of their argument on equitable defenses that they claim bar enforcement of the agreement. Although their argument on a potential bar related to the applicable statute of limitations was brought before the circuit court, their arguments related to waiver, estoppel, and unjust enrichment are not properly preserved for our review. Although they make up the bulk of the argument on appeal, those arguments were neither argued before nor ruled on by the circuit court. *See Brown v. Towell*, 2021 Ark. 60, at 8, 619 S.W.3d 17, 22.

The Grigsbys argue that the counterclaim was barred by the three-year statute of limitations on an oral promise because it involves conveyances made decades ago. *See* Ark. Code Ann. § 16-56-105 (Repl. 2005). The allegations arose from conduct alleged to have occurred more than twenty years ago, and the statute of limitations begins to run when there is a complete and present cause of action. *See Hunter v. Connelly*, 247 Ark. 486, 446 S.W.2d 654 (1969). And the Grigsbys argue that, absent fraudulent concealment, there is no tolling of the limitations period.

The Grigsbys' claim is that because the siblings were on notice of the grantees in the deeds in question, their claims are barred. They urge that filing a deed places one on constructive notice, and if one seeks to overturn a deed, the burden is clear and convincing evidence. *See generally*, *Betts*, *supra* (noting such proof is especially difficult by parol evidence).

The Grigsbys submit that in this case, because there is no evidence of fraudulent concealment, the applicable statute of limitations began running at the time of the action, not when later discovered. *Hampton v. Taylor*, 218 Ark. 771, 887 S.W.2d 535 (1994). When the warranty deeds were filed, all the siblings were on constructive notice of the Grigsbys' claims to the Land, as that knowledge is imputed from the filing. Once it is clear from the face of the complaint that the limitations period has run, the burden shifts to show it was tolled. *Meadors v. Still*, 344 Ark. 307, 40 S.W.3d 294 (2001). Here, the Grigsbys argue that because the siblings failed to meet that burden, their counterclaims for reformation arose long ago, and the counterclaim is time-barred.

In its November 7, 2019 letter opinion, the circuit court addressed this issue as follows:

> In making its ruling, the Court is rejecting the plaintiff's legal arguments based on any of several statutes of limitation or equitable principles of laches. The Court finds there was an agreement based on a promise by Mr. Grigsby to hold the land for the siblings. The Court finds Mr. Grigsby never repudiated his promise. Therefore, none of the asserted periods of limitations started to run. The Court found Mr. Murdoch's brief and *Davidson* case cited therein very convincing.

*Davidson v. Sanders*, 235 Ark. 161, 357 S.W.2d 510 (1962 ), involved heirs who had obtained title to property on which delinquent taxes were owed. A bank was unwilling to

enter into a loan for the purpose of paying those taxes because of the number of principals. Accordingly, the heirs agreed to convey the land to one of the heirs, a grandson, who then purportedly agreed to convey the property back once the loan was repaid. The heirs later demanded the agreed-upon conveyance, and the grandson refused. The property in question was later sold. The Arkansas Supreme Court held that legal title was in the grandson but was subject to a trust for the heirs and that the grandson stood in a confidential relationship to those heirs, who put their trust and confidence in him. *Id.*

We agree that the *Davidson* facts are similar to the facts in this case, including that the grandson pleaded laches, estoppel, statute of limitations, statute of frauds, and almost every other equitable defense against the other heirs. Another similarity between the two cases is that the original owner of the land had been about to lose the land due to financial difficulties—specifically, the inability to pay taxes and assessments on the land. The supreme court noted that the action was not filed for a period of fourteen years after title was obtained, which caused the grandson's successor in title to raise the various defenses previously described.

At the time of the appeal, the underlying indebtedness that was the catalyst of the entire agreement had not been paid. The *Davidson* court, quoting *Walker v. Biddle*, 225 Ark. 654, 284 S.W.2d 840 (1956), and *Matthews v. Simmons*, 49 Ark. 468, 5 S.W. 797 (1887), held that it was the refusal of the promise that brought the trust into agreement; thus, the fourteen-year delay was immaterial. Further, it noted that while no specific documents evidenced the promise in question, other documentation did support the existence of the

12

agreement, and without a repudiation, no statute-of-limitations bar could occur. *See also Gregory v. Gregory*, 2013 Ark. App. 57, at 8, 425 S.W.3d 845, 850 (holding that because it was the transferee's repudiation of his oral promise that brought a constructive trust into being, the statute of limitations in favor of the constructive trustee could not commence earlier than the date of such repudiation).

Because the Grigsbys principally rely on the statute-of-limitations defense to the siblings' counterclaim, they were required to show that Mike repudiated the agreement between Leon and him to start the three-year period running, and there is no evidence of that before us. Silence does not equal repudiation. The agreement could not even be considered to run until both Leon and Estalee died because that was the catalyst for Mike's division of the Land between the siblings. The earliest date this could have occurred was on Estalee's death on October 31, 2006. However, at that time, there still existed the remaining expenses from Leon's funeral to be repaid, which Mike referred to in exhibit 8. Additionally, there was evidence regarding the family meeting about the division of the Land in 2007 and the subsequent related listing agreement as well as Mike's critically important acknowledgement in exhibit 8 stating that he had never said he would not distribute the Land among the siblings.

To reiterate, certain portions of Mike's written statement in exhibit 8 indicate that the triggering event for the division of the Land would be the payment of the remaining indebtedness related to Leon's 1995 funeral expenses owed to him by siblings Charles and Barbara. No one disputed that Charles and Barbara still owed their respective shares of the

expenses and should pay their portions. This evidence also helps to explain Patsy's statement that the Grigsbys "held the [L]and hostage" as no one else could receive their portion until all of Leon's funeral indebtedness was repaid. The record supports that evidence of an agreement between Leon and Mike for Mike to divide the Land among the siblings was presented to the circuit court, not only by way of the testimony from all the parties but also by the various exhibits that were introduced into evidence, all of which show an agreement that, pursuant to the language in Eexhibit 8, had not been repudiated by Mike. Had no one filed an action related to the Land, as was done in this matter, the promise and agreement likely still would not have been repudiated to this date. However, on March 13, 2017, the Grigsbys filed their original petition in this action against Patsy, which could be viewed as a repudiation of Mike's agreement to divide the Land among the siblings after the death of both of the Fords. Patsy brought in the remaining siblings in her response to the petition and counterclaim less than three weeks later, on March 31, well within three years from that date. Accordingly, we hold that the circuit court did not err in rejecting the Grigsbys' claim based on the defenses of statute of limitations or laches.

## B. Constructive Trust

The Grigsbys also argued in their motion to dismiss the siblings' counterclaim that Count II of the amended counterclaim fails to state facts on which relief can be granted pursuant to Ark. R. Civ. P. 26 (2021) and that it also fails to state facts that give rise to constructive fraud on behalf of the siblings to impose a constructive trust. *See Waller v. Waller*, 15 Ark. App. 336, 639 S.W.2d 61 (1985). The Grigsbys specifically argue in their brief before

this court that the siblings failed to meet their burden of proof to establish a constructive trust. We disagree.

On page 2 of Mike's written statement dated April 10, 2017, exhibit 8 that was jointly introduced by the parties at trial, he acknowledges that there was an agreement between Leon and him that the Land would be divided, stating that "I've never denied what Leon told me to do with the [L]and," and "He told me to divide the [L]and between the kids after paying all bills by selling land, if any land was left. There was never discussing about how to divide, that was left up to me." We hold that the circuit court reasonably could have found that Mike's acknowledgment dismisses any argument he now raises regarding a constructive trust.

In order to impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts. *Betts*, 326 Ark. at 548, 932 S.W.2d at 338. In addition, the burden is especially great when title to real property is sought to be overturned by parol evidence. *Id.*

The supreme court held in *Davidson*, *supra*, that fraud was not essential to the establishment of a constructive trust and that one will be imposed if it is shown by clear and convincing evidence that the conduct was either fraudulent *or* that the grantor and grantee were in a confidential relationship. 235 Ark. at 172–73, 357 S.W.2d at 516–17. This court in *Gregory*, 2013 Ark. App. 57, at 8, 425 S.W.3d at 850, likewise held that proof of fraud is not essential to the establishment of a constructive trust. One can occur as a result of circumstance. And in *Waller*, *supra*, we noted:

15

Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial interest against one who secured legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his own, or who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud.

15 Ark. App. at 339, 693 S.W.2d at 63 ( citations omitted in original). The record supports a finding by the circuit court that Mike violated the confidential relationship he had with Leon and their agreement that he was to divide the Land among the siblings. Accordingly, the circuit court was within its authority to order a resulting or constructive trust as the result of the circumstances and actions of the parties.

Here, the circuit court had not only an abundance of written statements and testimony from the witnesses to consider but also exhibits generated at the instance of the Grigsbys—who oppose the imposition of the constructive trust—show actions inconsistent with their testimony and actually support implementation of a constructive trust.

Affirmed.

HARRISON, C.J., and WOOD, J., agree.

*Roberts S. Tschiemer*, for appellants.

One brief only.

16